Argued and submitted March 23, 2001; resubmitted en banc May 14, reversed May 29, 2002

In the Matter of
Destinee Mae Mellor, a Minor Child.
STATE ex rel STATE OFFICE
FOR SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Mendi Jo MELLOR,
*Respondent.*
98-11-28J; A112003 (Control)

In the Matter of
Destinee Mae Mellor, a Minor Child.
STATE ex rel STATE OFFICE
FOR SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Richard Lee MELLOR,
*Respondent.*
Petition Nos. 98-11-28J-02, 98-11-28J-03; A112004
(Cases Consolidated)

47 P3d 19

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy

Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Theresa M. Kohlhoff filed the brief for respondent Richard Mellor.

No appearance for respondent Mendi Jo Mellor.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

DEITS, C. J.

Edmonds, J., dissenting.

**DEITS, C. J.**

The State Office for Services to Children and Families (SCF) appeals from judgments denying its petitions to terminate mother's and father's parental rights to their child, D. SCF argues that it presented clear and convincing evidence that mother and father are unfit and that termination is in D's best interest. ORS 419B.504; ORS 419B.500; ORS 419B.521(1). On *de novo* review, ORS 419A.200(5)(b), we agree and reverse.

We begin by setting out background facts and the facts leading to D being taken into SCF custody. We describe additional facts in connection with the relevant discussion of factors supporting termination. Mother has four children, two with father. Mother's oldest child, A, is in foster care in Washington. At the time of trial in July 2000, a petition for termination of mother's parental rights to A, who was then nine years old, had been filed in Washington. Her second child, C, lives with his biological father, and mother has no contact with him. Her third child, D, and her first with father, is the subject of this termination proceeding and has been in foster care since she was 13 months old. Her fourth child, J—her second child with father—has been in foster care in Washington since October 1999, when he was three months old.

D was born on September 24, 1997. Although mother had had a history of housing instability, she and father lived in the same apartment for approximately two years, including most of the time D was in mother's and father's custody. Mother and father separated briefly beginning in late October 1998. The circumstances of this separation are somewhat obscure. Mother and D went to mother's brother's apartment to drop off some things she had been keeping for her brother. Mother and father had had an argument before mother left for her brother's apartment. When she arrived at her brother's apartment, she met a man, Flannery, who also lived in the apartment. Flannery told mother that her brother had said that father did not treat her well and that he, Flannery, could do better. Mother explained that she decided at that time to move in with Flannery

because she felt that father had withdrawn his affection from her in favor of D and that father monopolized child's attention. Mother later explained that "I was being selfish. I wanted my daughter to myself. I didn't want to share her."

Mother lived with Flannery for approximately three weeks. D lived with them for part of the time. Mother's brother and his wife also lived in the apartment. Mother knew that her brother was a convicted sex offender prohibited from having contact with minors. However, brother lived in the apartment while mother and D lived there. Although mother testified that her brother moved out because she and D moved in, the trial court found mother's testimony on this point to be not credible, and so do we.

Shortly after mother moved out, father obtained a restraining order prohibiting mother from having contact with D. In his application for the restraining order, father alleged that mother had hit him and D. At trial, however, father said that there had never been domestic violence in his household. Father explained that he had not filled out the application for the restraining order but had let a friend fill it out and thought that the contents of the application were "none of my business." Father apparently used the restraining order to convince mother to give him custody of D for a few days, but he later agreed to let mother take D with her to live with Flannery again.

On November 9, 1998, father called the Portland Police Department and asked to have D removed from mother's custody and given to him. Officer Hurley responded to the call. Hurley described the neighborhood of the apartment where mother was living as an area that is known to police for drug and gang activity. The apartment complex was subsequently closed down as a chronic crime site. When Hurley arrived at the apartment where mother was living, mother told her that father had had the restraining order dismissed on November 6. Hurley confirmed with the Clackamas County Sheriff's Office that the order had been dismissed, but she testified that she was still concerned about D's safety. Hurley's first concern was about mother's brother's access to D. She was also troubled by D's condition that night. Although it was a very cold night, mother brought

D outside for an extended time wearing only a light sleeper. Although Hurley asked mother several times to take D inside out of the cold, mother refused to do so. Later on, mother could find no clean or warmer clothes for D or any diapers. Mother told Hurley that she had brought six diapers when she had taken D back from father three days before and had not bought any more.

D was dirty and her clothes were dirty and smelled bad. Hurley testified that, when she changed D's clothing and diaper later at the police station, she saw that "[h]er feet were so dirty that they were almost black. It was very obvious that this child had not been bathed in a long time. Her face was dirty. Her hands were dirty. * * * She had dirt under her toes and fingernails." Mother gave Hurley a bottle to take with her that appeared to have mildew in it. Hurley contacted SCF and, at the direction of D's caseworker, took D into custody.

Also on November 9, father was arrested in connection with the dismissed restraining order. Father took the position at trial that it was not his idea to try to get D back that night. He said that some of his sister's friends came to his house, saw that he was unhappy, and decided that he needed to get his child back; according to father, he just went along with what they told him.

After D was removed from their custody, both mother and father entered into several service agreements with SCF. Although mother and father did participate in many of the services identified in the agreement, SCF found that mother and father were not making any significant changes as a result of the services. We disagree with the dissent that mother and father "fully" participated in services. 181 Or App at 496 (Edmonds, J., dissenting). Based on that failure and on a October 1999 psychological evaluation by Dr. Ewell, which we discuss in some detail below, 181 Or App at 479-80, SCF decided to seek termination of mother's and father's parental rights to D. In May 2000, SCF filed petitions to terminate their parental rights. Although the petitions alleged both unfitness, ORS 419B.504, and neglect, ORS 419B.506, SCF pursues only the unfitness ground on appeal.

■ Our task on *de novo* review is to determine whether clear and convincing evidence in the record supports the conclusion that mother and father are presently unfit to parent D as a result of conduct or conditions that are seriously detrimental to D and that the integration of D into mother's and father's home is improbable within a reasonable time due to conduct or conditions not likely to change. ORS 419B.504; *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). The standard of clear and convincing evidence requires a showing that it is highly probable that mother and father are not presently able, and will not be able within a reasonable time, to meet D's physical and emotional needs. *State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000). If that standard is satisfied, we must then decide whether termination is in D's best interest. ORS 419B.500; *State ex rel SOSCF v. Hammons*, 170 Or App 287, 297, 12 P3d 983 (2000), *rev den* 331 Or 583 (2001).

As the Supreme Court explained in *Stillman*, generally, a court may terminate parental rights for the purpose of freeing a child for adoption if "the court finds that termination is in the best interest of the child." 333 Or at 144. The court further observed that the "specific bases" for termination are set out in ORS 419B.502 to ORS 419B.508. *Id.* One of those statutes, and the statute relevant here, is ORS 419B.504. Under ORS 419B.504, parental rights may be terminated if we conclude that parents are "unfit by reason of conduct or condition seriously detrimental to the child" and that "integration of the child into the home of the * * * parents is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504 provides a nonexclusive list of factors that the court must consider in determining whether a parent is unfit and in determining whether the circumstances making the parent unfit are unlikely to change. *Stillman*, 333 Or at 147 ("statutory examples [in ORS 419B.504] are just that—examples"). The statutory factors relevant to this case are:

> "(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2)   Conduct toward any child of an abusive, cruel or sexual nature.

"\* \* \* \* \*

"(4)   Physical neglect of the child.

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." ORS 419B.504.[1]

In the petitions for termination, SCF advanced several considerations for determining mother's and father's unfitness, several of which overlap with the statutory considerations set out above. With respect to mother, SCF asserted:

"a)   Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so the return of the child to the parent is possible.

"b)   Failure to present a viable plan for the return of the child to the parent's care and custody.

"c)   Failure to learn or assume parenting and housekeeping skills sufficient to provide for the safe and proper raising of the child.

"d)   An emotional illness, mental illness or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"e)   Failure to protect the child from physical and sexual abuse.

"f)   Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

SCF asserted the same conduct or conditions with respect to father, with the addition of

---

[1] ORS 419B.504 was amended in 2001. Or Laws 2001, ch 686, § 24. The parties do not argue that this amendment affects this case. All references in this opinion are to the 1999 version of ORS 419B.504.

"[l]ack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible."

Although we will address individually many of the factors stated in the statute and asserted by SCF, we stress that the overall determination is whether mother and father are "unfit by reason of conduct or condition seriously detrimental to the child." ORS 419B.504. Accordingly, our concern is whether, considered together, conduct and conditions established by the evidence are seriously detrimental to D. That a single factor, standing alone, would not support termination is not determinative of whether mother and father are unfit. D is exposed to all of the proven conduct and conditions together, and our unfitness determination is similarly based on consideration of that combination of conduct and conditions and on whether that combination is seriously detrimental to D.[2]

---

[2] The dissent states that, to avoid termination of parental rights, parenting skills must be only "minimally adequate." 181 Or App at 505 (Edmonds, J., dissenting). We agree that parents need not establish that they meet some kind of model parenting standard in order to avoid termination. However, the dissent makes two related points that require discussion. First, the dissent states that "minimally adequate" parenting for purposes of this case is equivalent to parenting at the skill level mother and father demonstrated before D was taken into SCF custody. *Id.* However, we do not necessarily know that their parenting was adequate before SCF took custody of D. There is minimal evidence in the record as to the adequacy of the care that mother and father provided to D before SCF's intervention. As we will discuss, there is evidence of at least mother's difficulties with caring for her other children before SCF intervened in this case. There is evidence in the record, as the dissent cites, that might indicate that mother and father engaged in at least some positive interaction with D. *Id.* at 505-06. That SCF did not intervene earlier cannot, however, in our view, be taken to mean that SCF believed, or that we must accept, that mother and father were functioning at a "minimally adequate" parenting level before child was taken into custody. Unfortunately, it is likely true that there are many parenting situations that would justify termination even before SCF intervenes. In our view, our role on *de novo* review is simply to evaluate the evidence presented of mother's and father's conduct and conditions under the statutory standard and determine their fitness at the time of the termination hearing.

Second, the dissent states that "transiency, incapacity to parent at an optimal level, poverty, or instability alone are not proper grounds for termination." *Id.* at 505. To the extent that the dissent means that any conduct or condition must also have a "serious detriment" to a child in order to support termination, we agree. However, we note, as did the Supreme Court in *Stillman*, that the legislature amended ORS 419B.504 after *State v. McMaster*, 259 Or 291, 486 P2d 567 (1971), to expressly include at least some of those kinds of conduct as grounds for termination—grounds that require establishment of "serious detriment" as well, but

■ Moreover, we conduct our inquiry not in the abstract but with emphasis on the practical effect of mother's and father's conduct and conditions on D:

> "ORS 419B.090 demonstrates the broader context of the two inquiries under ORS 419B.504. That statute declares that it is the 'policy of the State of Oregon to recognize that children are individuals who have legal rights.' ORS 419B.090(2)(a). Those rights include the right to '[p]ermanency with a safe family.' ORS 419B.090(2)(a)(A). * * * Consistent with the foregoing legislative policy, the focus of both parts of the test for termination under ORS 419B.504 is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Stillman*, 333 Or at 146.

We first consider evidence related to any mental or emotional illness or disorder that might render mother or father incapable of caring for D. ORS 419B.504(1); *see State ex rel Juv. Dept. v. DeVore*, 108 Or App 426, 816 P2d 647 (1991). Under ORS 419B.504(1), a diagnosis of a mental or emotional illness or disorder standing alone is not enough; there must also be evidence that the illness or disorder renders the parent "incapable of providing proper care for the child for extended periods of time." *See also Johnson*, 165 Or App at 158-59 (stating that the statute requires more than a diagnosis).

■ Some of the evidence about each parent's mental and emotional condition overlaps. Several health care providers testified about mother's and father's mental and emotional conditions and the effect of those conditions on mother's and father's ability to provide proper care for D. Deborah Baker, a marriage and family therapist, conducted a couples evaluation of mother and father at the request of SCF. She testified that their relationship was "narcissistic borderline." Baker explained that, in a narcissistic borderline relationship, one partner—in this case mother—focuses on her own needs to the exclusion of the needs of others, while the borderline partner—in this case father—has strong needs to regulate intimacy and engages in patterns of pulling people closer to

---

nonetheless are designated in the statute as grounds for termination. *Stillman*, 333 Or at 151-52.

him but then withdrawing from them. Baker further testified that the dynamics of such a relationship could have a negative effect on parenting because, in narcissistic borderline relationships, the needs of the parents can take precedence over the needs of the child, restrict empathy with the child, and lead to limited thinking in evaluating a child's best interests. The evidence of mother's and father's behavior provides examples of such a condition. As we will discuss, mother's and father's seeming inability to connect with D and their occasional indifference to D is indicative of this condition. With respect to mother, Baker noted that an example of the manifestation of this condition was that mother would play Nintendo between six and thirteen hours a day. Mother said that she believed that D was safe during that time because she kept her in a high chair. Baker also noted that father suffered from depression, for which he was taking medication, and that this condition negatively affected his parenting activities. Overall, Baker stated, "I did not see very much empathy during the evaluation. Neither parent at that time could seem to show any concerns about [D's] needs."

In July 1998, Dr. Perry Dudley, a psychologist, evaluated mother and father at the request of the Washington Department of Social and Health Services. Dudley diagnosed mother as presenting with post-traumatic stress disorder related to past sexual abuse, borderline intellectual functioning, and "personality disorder not otherwise specified with cluster B features." Dudley explained that a "personality disorder" is a disorder in how a person thinks or relates interpersonally and that, in mother's case, her personality disorder included anger control problems and difficulty seeing things from others' perspectives, inhibiting impulses, and exercising self-control. Dudley further testified that, given mother's diagnoses, it would probably be difficult for her to benefit from treatment and parenting training. Dudley diagnosed father with a "mixed personality disorder" with primarily avoidant and antisocial features. Dudley further testified that father could not answer a number of standardized questions about parenting skills. Dudley characterized father's prognosis for improvement as "poor."

In October 1998 and April 1999, Sharon Brewer, a licensed counselor, conducted "anger management parent

assessments" of mother and father. Brewer reported that, although father resisted taking the assessment, she was ultimately able to conclude that he had significant problems with anger management and depression. Brewer further testified that some of the results of father's assessment indicated that he was at a high risk for physically abusing a child. Brewer explained that typical child abuse potential scores for the kind of assessment she conducted are in the 40 to 150 range, while father's score was 287. She also stated that therapy for father would likely take several years.

Finally, in October 1999, SCF requested that Dr. James Ewell conduct a comprehensive psychological evaluation of mother and father, as well as a "parent/child interaction observation." Ewell was unable to evaluate father because father refused to cooperate. After Ewell had conducted the parent/child observation, father left Ewell's office; Ewell was later told that father had decided not to complete the evaluation.

Ewell diagnosed mother with mild mental retardation; post-traumatic stress disorder, chronic; adjustment disorder with mixed disturbance of emotions and conduct; and "personality disorder not otherwise specified." Ewell explained that a personality disorder like mother's "has a significant impact usually on parenting, a significant major impact. Individuals who are personality disordered, by definition, tend to lead rather chaotic, traumatic lives where there is upheaval, instability. And that, of course, flies in the face of what a child needs as far as consistency, predictability and love in [his or her] life." Ewell concluded that mother was not an appropriate placement for D, that the prognosis for change was very poor, and that he could not recommend any forms of intervention to remedy that prognosis. Ewell explained why his evaluation was so negative:

> "When I then talked to her and tried to engage her in conversations related to parenting and how she might interact with the child, I talked to her about her family life and how she understood the children, and her history, I was very surprised at the lack of insight that I saw from a person who had gone through programs of intervention. I would have expected for someone who had gone through

such programs for there to be a deeper understanding and insight.

"In addition to that lack of understanding and insight, it was clear to me that she was quite angry. She did not feel she needed much more intervention. I believe she said possibly some family counseling or some marital counseling. But she did not seem to, from my opinion, grasp the severity of her circumstance and the need for fairly intense long-term intervention. The fact that she did not grasp that or did not seem to be very amenable to treatment is also a negative prognostic indicator.

"A third reason that it is so bleak is that at least one of the conditions diagnosed, that a limited cognitive ability doesn't change with intervention. That stays pretty much the way it is. And when an individual, in addition to the limited intellectual ability, has these other forms of maladjustment that I have also described, the entire picture is very negative. And in this case it led me to conclude that I could not come up with other programs that I thought would be likely to be helpful."

Ewell also testified that he was "concerned * * * that there would be a strong risk of some emotional traumatization to the child because of [mother's] conditions and how those negatively [affect] her ability to parent and also as a result of what I understand to be a fairly continuous upheaval, turmoil, lack of progress in terms of stabilizing her life." Finally, Ewell stated that his evaluation indicated that mother did not have the ability to provide the stable and nurturing environment necessary to children.

We have affirmed the termination of parental rights when the parent is diagnosed with mental or emotional problems that make the affected individual unfit to parent. *State ex rel SOSCF v. Frazier*, 152 Or App 568, 600, 955 P2d 272, *rev den* 327 Or 305 (1998). There is clear and convincing evidence in this record that mother and father suffer from mental and emotional deficiencies. Although the deficiencies suffered by mother and father are different, each parent's deficiencies render him or her presently unfit to parent D. As noted above, the trial court in this case, in a very thoughtful and detailed opinion, denied the petitions to terminate

mother's and father's parental rights. In reaching that disposition, the court concluded that, although mother and father were not model parents and, in fact, had serious deficiencies as parents, the state had not proved that mother and father were presently unfit to parent D. In our view, however, the trial court erred in overlooking the consistent opinions of the experts who evaluated mother's and father's conditions and the many persons who worked with mother and father that these parents were not presently capable of caring for D and that the prognosis for mother and father acquiring minimally adequate parenting skills was not good. The persons who evaluated and worked with these parents did so in a variety of capacities over a significant period of time and represented a number of different social service entities.

The evidence of mother's and father's conduct is consistent with the opinions of those who worked with and evaluated mother and father and expressed reservations about their present fitness as parents and their ability to change. This conduct demonstrates how the mental and emotional deficiencies, identified by those who worked with and evaluated them, make them unfit parents. For example, each parent seemed to view D as a means of satisfying his or her own emotional needs: mother explained that she moved in with another man because father had withdrawn his affection from her in favor of D and because she wanted D to herself, while father misused the restraining order process in order to regain custody of D. As another example, there is evidence that, at least at times, mother has neglected the health of this child and one of her other children.

There is also considerable evidence of instability in mother's and father's lives. It appears that, since November 1998, when D was removed from the home, until the time of trial, they had been homeless, living in homeless shelters (one of which they were asked to leave), and apparently living somewhat of a nomadic existence, moving frequently in and out of the homes of relatives and friends. Mother's and father's relationship also appears to be unstable. Although they apparently remained together as a couple, father testified that mother left him on a monthly basis. Mother admitted that she did leave father for affairs, but not as frequently as he claimed. As explained by Baker, a marriage and family

therapist who evaluated them, the process of breaking up and reuniting "creates a lot of problems in the home."

The record here also includes considerable evidence of how mother's and father's conduct and conditions have had or pose a risk of a seriously detrimental effect on D. Many of the experts who evaluated mother and father, and many of the social service workers who worked with mother and father, expressed serious concerns about D being left in mother's and father's care. Jenny Keys, a parent mentor who worked with mother and father concerning their parenting of D and her younger sibling for 10 months beginning in March 1999, was very concerned about their ability to provide minimal care for D. She indicated that, in addition to being concerned about inappropriate actions by mother and father in their interaction with D, she was very concerned for D's safety. At the time that her work with mother and father ended in December 1999, Keys recommended that mother's and father's visits with the children be closely supervised. She stated:

> "I have extreme concern for the safety and well being of [D and J]. During the ten months that I have worked with this family I have seen limited improvement in parenting skills and, in fact, have seen a sharp decrease in [father's] behavior, demeanor, parenting abilities, etc."

During a psychological evaluation that took place after mother and father had taken parenting classes and participated in sessions with a parenting mentor, Ewell reported that both parents, especially father, were very emotionally distanced from D and that they displayed "[v]ery few parenting skills." Ewell described father's demeanor during the evaluation as "rough" and "angry." Ewell stated that D seemed confused by her father's behavior and avoided approaching him. He further stated that D was "withdrawn" from both parents. He characterized the emotional distance displayed between mother and father and D as "remarkable" and "alarming." Ewell explained that he asked mother's and father's caseworker to come into the room during his observation because he was concerned that there was a danger to D. According to Ewell, who said that he had done about a thousand such evaluations, this rarely happens during an

observation. In his written report, Ewell summarized his parent/child observation as follows:

"The most salient feature of this parent/child observation was the fact that neither [mother nor father] expressed much affection toward their daughter. Neither parent attempted to structure the visitation, or encourage their daughter's enjoyment. [Father] was extremely withdrawn and self-isolating. In fact, he appeared quite menacing and 'scary.' He complained frequently about his back pain. [Mother] did not respond to him. Much of the interaction was spent in silence.

"During this observation, very few parenting skills were noticed. [D's] behavior was appropriate, so there was no need for either parent to intervene. Their lack of emotional spontaneity and encouragement was alarming. They did very little to reassure their daughter, or attempt to amuse her. Rather profound deficits would be suggested by the materials gathered during this observation."

As late as June 2000, Donna Schafte, a parent educator at Clark College in Vancouver who had taught mother and father in a 10-week parent-training program, stated that, in her opinion, before D could go home, mother and father would need a "[t]remendous amount of support. I would almost say a live-in, someone there consistently to begin [with]." She said that someone from a social services agency would need to be with them all the time. Schafte emphasized that both parents displayed significant anger problems and that, consequently, she would have fear for children living in their home.

As is evident from the comments of the social services workers who have worked with mother and father and the experts who have evaluated them, a major component of mother's and father's lack of ability to provide adequate parenting relates to their inability to identify risks to D and protect her. The incident where mother went to live at her brother's home is an example of their extremely poor judgment regarding D's safety. Mother acknowledged that her brother was a convicted sex offender, for what she characterized as "sex abuse on a girl." However, she insisted that, when she went to live in his home, he moved out. The trial court did not believe mother, nor do we. Mother also said that

she did not believe her brother was a sex offender. When father was asked if he was concerned about D living in mother's brother's home, he said "not really. That's her uncle." He also expressed the view that the brother was falsely accused and that he did not pose a risk to D.

Although not determinative, a parent's conduct with respect to children who are not the subject of a petition to terminate may be pertinent to a parent's fitness. The negative effect of mother's and father's mental and emotional deficiencies on their ability to care for D is also demonstrated by the behavior they exhibit in interacting with their younger child, J. During supervised visits, father would pick up J—then an infant—by his arms or by one arm. Father tried to feed six-week-old J a bottle by placing him in a car seat and propping his bottle up in the seat. Moreover, the addition of J to their family seems to have placed an additional burden on mother's and father's already overtaxed ability to parent D. Parent mentor Keys stated that, after J was born, mother and father struggled to divide their attention between the two children and that mother had a hard time focusing. Father would generally focus on J during visits while excluding D.

Mother's behavior with her oldest child, A, also underscores her parenting deficiencies. A was removed from mother's home at three weeks of age after community health nurses informed SCF that A was losing weight at such an alarming rate that his life was in danger. After several weeks in the hospital, A was released back into mother's custody. After about six months, mother voluntarily placed A with her mother. After her mother disappeared with A for several weeks, SCF took A into custody and placed him in foster care, citing employment and housing instability and parenting deficiencies. Although mother participated in some parenting training programs regarding her care for A, her SCF caseworker at that time, Walter Wickline, testified that he never became comfortable returning A to her care. Wickline explained that mother "came to be a new mom with far more barriers than many young women that I met." He further explained that mother could talk about parenting skills that she had learned, but she could not apply them in dealing with A.

Antonia Rathburn, a child therapist, testified about therapy sessions she had with mother and A beginning in December 1998. Rathburn explained that mother could not adjust her interaction with A to his true level and instead insisted on directing A's actions as if he were more mature. Rathburn testified that mother appeared to be unable to learn from A's responses and modify her approach to suit his developmental age; instead, she proceeded to forcibly instruct him, causing him increasing distress. Rathburn testified that mother was unable to put her own needs on hold and attend to A. According to Rathburn, mother entirely lacked skills in reading A's emotions and communicating her understanding to him and this induced anxiety in and damage to A.

In summary, mother has been diagnosed with a number of mental conditions: borderline intellectual functioning, a personality disorder that includes anger control and impulsivity problems, mild mental retardation, chronic post-traumatic stress disorder, and adjustment disorder. There is evidence that those conditions negatively affect mother's parenting skills: she is incapable of appreciating risks to D's safety and places D in unsafe situations, she has subjected D to chaotic and dangerous living conditions, and she neither understands nor pays sufficient attention to D's physical and emotional needs. Those effects establish that mother's mental and emotional conditions render her incapable of providing proper care for D for extended periods of time.

Father has been diagnosed or assessed with a mixed personality disorder with avoidant and antisocial personality features, anger management problems, depression, and a high child-abuse potential score. There is evidence that those conditions negatively affect father's parenting skills: he withdraws emotionally from D, he has shown limited concern about D's needs, he has demonstrated little understanding of basic parenting skills, and he does not appear to appreciate the risks that mother's conduct poses to D. Although father's mental and emotional conditions, and the effects of those conditions, differ from mother's, they are also sufficient to establish that father's mental and emotional conditions render

him incapable of providing proper care for D for extended periods of time.

We conclude that the evidence is clear and convincing that, because of their mental and emotional deficiencies, mother and father are not presently capable of providing proper care for D, that their conduct and condition have constituted a serious detriment to D in the past, and that the overwhelming bulk of the testimony from service providers indicates that there is a continuing risk of serious detriment to D in the future.

■ The nature of mother's and father's unfitness here, however, is not such that it could not be overcome with sufficient effort. Thus, a critical issue in this case concerns the efforts that mother and father have made, the effectiveness of those efforts, and the prognosis for mother and father becoming capable of providing proper care for child in a "reasonable time." ORS 419B.504. In assessing this issue, we first consider a factor set out in ORS 419B.504(5) and relied on by SCF in connection with father here—"[l]ack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible." The evidence regarding father on this point is not entirely negative. Father did attend parenting classes and counseling visits with D and, in some cases, traveled a significant distance to do so. More telling, however, is evidence demonstrating that father's participation was grudging and, at times, even hostile. Schafte, a parent educator who led one of the parenting classes that mother and father attended, stated that these parents were one of the most difficult couples she had taught in 28 years, due to their resistance to being in class. She further testified that father refused throughout the parenting class sessions to wash his hands at the beginning of class, which was a class protocol intended to minimize the spreading of disease. Father tended to be quiet and withdrawn during class and did not turn in optional homework that Schafte assigned. Mark Niskanen, a Washington social worker who worked with mother and father, testified that on one occasion, when D called her foster parent "mommy," father told Niskanen that he was going to jump over the counter separating them and "beat the crap out of" Niskanen.

Keys, a parent mentor who attended visits between mother and father and D at SCF, testified that, beginning in July 1999, father refused to work with her during the visits. Keys said that, when she tried to make parenting suggestions, father would make inappropriate comments and then increase the behavior that she had asked him to change or entirely disengage from interacting with child. During the last few months of her work with mother and father, Keys said father either focused on the other child, J, or on nothing at all. Staenke, another SCF worker who supervised visits between mother and father and D from November 1998 to October 1999, testified that father sometimes fell asleep during the visits or left during the middle of visits to go outside to smoke. Charmin Sadamori, an SCF caseworker who worked with mother and father beginning in early 1999, testified that, because of father's depression, she thought counseling would help him with his parenting skills. However, father was "pretty resistant" to obtaining counseling; Sadamori would make counseling appointments for father, but he would not show up. Another of mother's and father's caseworkers, Carrie Nash, testified that, while they were discussing visitation with D, father walked off as she was speaking.

Father himself admitted that he did not like people telling him how to parent and that that feeling made him less cooperative than he should have been. Father also testified that he stopped going to individual counseling because he just wanted to stop going. When asked about whether he sometimes did not participate with D during visits, father responded:

"All these people—all I can say is all these people can say anything they want. Everybody has their own opinion. Everybody can do as they want. But there is a lot of times that, yeah, I do. I would just sit there and don't do nothing. That's my time. Eventually I come out of it. I start playing with my daughter or my kids, you know. * * *

"* * * * *

"* * * I am to the point where I go to these visits, I don't feel like visiting with the kids. Big deal. I show up anyway."

When asked by the trial court about the reasons why he had been provided with parenting training and other services, father stated,

> "I'm not here to satisfy myself. I am here to satisfy other people, to prove other people are wrong. I think this whole thing is wrong, but that's not for me to say. The only thing I can do is do what I have been told, jump through the hoops, do everything that I am told, and hope to hell something good comes out of it."

The state is required to make reasonable efforts to assist parents in making the adjustments necessary to enable them to become minimally adequate parents. ORS 419B.504(5); *Frazier*, 152 Or App at 582. Whether the state has made reasonable efforts to provide services depends on the particular circumstances. *Id.* This factor also requires us to evaluate the effort expended by the parent and, in particular, whether the parent ignored or refused to participate in services. *See, e.g., State ex rel Juv. Dept. v. Oseguera*, 96 Or App 520, 526-27, 773 P2d 775 (1989).

As discussed above, in this case, mother and father were offered a variety of counseling and parent-training services. One of the social workers who worked with mother and father testified that they had "received more services than any other case I have ever had." Father does not argue, nor do we believe, that the services offered to him did not constitute "reasonable efforts." However, we find that father demonstrated a "lack of effort" to take advantage of those services and adjust his circumstances. He refused to participate in a psychological evaluation requested by SCF, he resisted reasonable hygiene protocols in parenting classes, he was withdrawn during parenting classes and visits with D, he fell asleep or left during visits, and he testified that, in his opinion, participating in services offered by SCF was "jump[ing] through hoops." Mere physical presence is not sufficient to satisfy the "effort" referred to in ORS 419B.504(5). The service providers who testified in this case consistently indicated that father was uninterested in, or even hostile to, their efforts. Father's own actions and words indicate that, at most, he was "going through the motions" with respect to offered services. The fact that father disliked the intervention of the social service agencies in his life and did not think

it was necessary cannot excuse his lack of effort and progress in making himself available as a parent. We conclude that the state proved by clear and convincing evidence a lack of effort on father's part to adjust his circumstances and conduct to make return of D possible.

■       SCF did not rely on lack of effort with respect to mother. 181 Or App at 475-76. Despite that difference, both mother and father—mother in spite of her efforts and father, at least in part, because of his lack of effort—have "fail[ed] * * * to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." ORS 419B.504(5). SCF alleged that mother and father have failed "to learn or assume parenting * * * skills sufficient to provide for the safe and proper raising of the child."

As noted above, there is clear and convincing evidence in this record that, at the time D was taken into custody, mother and father were not displaying adequate parenting skills. The evidence in this record further demonstrates that mother's and father's parenting skills have not improved to any appreciable extent despite extensive efforts by social services providers. As discussed above, mother and father have participated in numerous services offered by SCF and its Washington counterpart, some related to D and others related to their second child, J, and mother's first child, A. Several service providers testified at trial. As an overall matter, the testimony of those witnesses is remarkably consistent: Although mother and, to a lesser extent, father participated regularly and actively in the services that were offered to help them develop the skills to be better parents, neither one was able to demonstrate an improvement in applied parenting skills as a result.

Despite all of the services that these parents received, every service provider who testified continued to express reservations about allowing mother and father to parent D unsupervised. For example, as noted above, parent educator Schafte said that, even though mother and father had completed a 10-week parenting class that she had taught, she would fear for D if she were returned to mother's

and father's home and would recommend that someone from a social service agency be in the home at all times. Linda Mulherin, a Washington home support specialist, worked with mother and father from January to July 2000. She observed that "the connection isn't there" between mother and D and that mother and father seemed to be using the visits with D to meet their own needs, not D's needs. She said that she noticed no improvement in the interactions between parents and D during the time she was observing the visits.

Father appears not to have learned what kinds of interaction are appropriate with a child his daughter's age. Despite explanations from service providers about why it is inappropriate, father continued to "play" with child by grabbing her by the arms, "pretending" to punch her, and pulling her chair to startle her. Father did not respond to a parent mentor's concern that it was unsafe for him to swing D around unprotected in her car seat. Moreover, father does not seem to understand the importance of being nurturing and affectionate to D. During supervised visits, father provided inconsistent affection to D, often withdrawing his attention entirely or focusing on his younger child and refusing to interact with D. On several occasions during supervised visits, father called D "shit for brains." Not surprisingly, D has become increasingly wary of father and, ultimately, not interested in interacting with him.

Several service providers testified that, although mother could repeat back what she had learned about parenting, she could not apply that information. Although mother would state that her parenting skills had improved, she would deny that there had been anything wrong with her parenting to begin with. Furthermore, mother characterized herself at times as a "perfect parent." When confronted with the report that D was not in good shape when she was taken into care by the police, she denied that that report was true. Mother is unable to interact with D on an age-appropriate level, continually subjecting D to expectations that are unrealistic for her age. Despite warnings from service providers, mother continues, during supervised visits, to fail to understand D's mental and physical capabilities or what mother should do to protect D from injuring herself. Mother

has not been able to apply what she has been taught in parenting class to provide a developmental-age-appropriate environment and toys for D; instead, mother selected toys that were developmentally too advanced or too fragile for D. Counselor Brewer assessed mother's motivation for treatment as "fair to poor." As noted above, Ewell, who did a psychological evaluation of mother, described her prognosis for improvement as "very poor."

Both parents seem to be unable to understand the emotional effects of their behavior on D and continue, despite contrary instruction, to put their emotional needs above those of D, to use D as a bargaining piece in their own relationship, and to inappropriately bring up their own relationship problems in front of D. Father's misuse of the restraining order process is an example of how these parents use D for their own purposes, instead of putting her needs ahead of their own. As discussed above, neither parent fully recognizes the danger from exposing D to mother's brother, a convicted sex offender.

In mother's case, although she has participated relatively compliantly in social services, she continues to demonstrate inadequate parenting skills. Despite extensive parenting training and other services she has received, mother continues to be unable to interact with D on an age-appropriate basis, to protect D from dangerous situations, and to subject D to inappropriate emotional demands. In father's case, his failure to improve his parenting skills may be attributable in part to his refusal to fully participate in some of the offered services. 181 Or App at 486-89. SCF has, however, offered father an extensive array of services and education, and his parenting skills have not improved as a result. Father continues to engage in unsafe and threatening behavior with respect to D and fails to understand why it is important to nurture D and show her affection. Despite parenting training and other services, child is afraid of father. Finally, like mother, father subjects D to inappropriate emotional demands by using her as a bargaining piece in their relationship.

To summarize, we conclude that the state established by clear and convincing evidence that mother and

father suffer from a number of mental and emotional conditions that make them unable to provide proper care for D. 181 Or App at 477-86. In addition, mother and father have failed, despite extensive efforts of social service agencies, to effect a lasting adjustment to their parenting skills such that it appears they can safely care for D. 181 Or App at 486-91. In addition, the state established by clear and convincing evidence that father has demonstrated a lack of effort to adjust his circumstances and conduct to make a return of D possible. 181 Or App at 486-89. Taken together, 181 Or App at 476, the conduct and conditions proved in this record are seriously detrimental to D such that mother and father are unfit.

■     The most difficult question presented by this case is whether "integration of the child into the home of the * * * parents is improbable within a *reasonable* time due to conduct or conditions not likely to change." ORS 419B.504 (emphasis added). A "reasonable time" is defined as "a period of time that is reasonable given a child's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21). Consequently, we must consider all of the circumstances of each individual case, including the mother's and father's conditions and conduct, their impact on the child, and the child's individual needs. As discussed above, mother and father have a number of conditions and have engaged in conduct that shows that they are not presently capable of taking proper care of D. There is also evidence of the extensive services that mother and father have been provided and the minimal, if any, improvement in their parenting skills that has resulted.

The evidence indicates that, at the time of trial, at which time she was three years old, D seemed to be functioning reasonably well. At that time, she had spent well over half of her life in foster care. There was evidence, however, from the expert witnesses, that further instability and delay in establishing a permanent home for D would be damaging to her. Dr. Ewell testified:

"Well, you mentioned that there have been several, two or three anyway, different placements for this child already

in her young life. One placement is considered very disruptive to a child. I don't believe that anyone in the field of psychology or studying child development sees placement in foster care as a good thing for a child's development. It is seen as the lesser of evils.

"When a child has multiple placements in foster care and then is returned home and that fails, the likelihood of the child developing severe forms of pathology in his or herself increases. In the adults that I evaluate where I find high levels of maldisturbance or maladjustment, I often find histories themselves of having been placed in substitute care as a child or having significant changes in care providers.

"So given that this child has already experienced two or three different placements, I would say it would be very risky for this child to have another move. And that that move, from a psychological perspective, should only take place if it is a virtual certainty or guarantee that she will be moving to a more stabilized, adjusted, healthy environment."

Considering all of the circumstances here, we conclude that integration of D into mother and father's home is improbable within "a reasonable time." These parents have received extensive social services over an extended time with little, if any, improvement to show for it. Their trial testimony indicates that they continue not to appreciate the effects on D of their self-centered, destructive, and unsafe behavior, nor do they understand the skills needed to safely parent a child of this age. In addition, mother's and father's mental and emotional conditions and father's resistance to intervention are unlikely to change. We conclude that mother and father are unfit under ORS 419B.504.

■ ■ We turn to the question of whether termination of parental rights is in this child's best interest. ORS 419B.500. "Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide a [wholesome and healthful] environment, the best interests of the child(ren) generally will require termination of that parent's parental rights." *State ex rel Juv. Dept. v. Geist*, 310 Or

176, 189, 796 P2d 1193 (1990). In this case, there is substantial and uncontroverted testimony from social service providers and psychologists that indicates that there is nothing that can be done to enable mother and father to become adequate, safe parents within a reasonable time. We accordingly determine that it is in D's best interest that mother's and father's parental rights be terminated and that child be freed for adoption.

Reversed.

**EDMONDS, J.,** dissenting.

In this termination of parental rights case, the majority holds, on *de novo* review, that the State Office for Services to Children and Families (SCF) has presented clear and convincing evidence that father's and mother's parental rights should be terminated. The trial court held to the contrary in, as the majority aptly describes it, "a very thoughtful and detailed opinion." 181 Or App at 480. The trial court had the benefit of viewing the witnesses in court and hearing live testimony. Moreover, my own review of the record does not persuade me that SCF has carried its burden of proof. For those reasons, I dissent.

The majority and the trial court do not disagree significantly about the facts that led to the juvenile court taking jurisdiction over the child involved in this case. The child, D, was born on September 24, 1997, is mother's third child, and is mother's first child with father. Mother's oldest child, A, is in foster care in Washington. Her second child, K, lives with his father, and mother has no contact with him.[1] For the first 14 months of her life, D lived with parents. Although Washington State child protective service workers were involved with the family for that period of time, they found no cause to remove D from the home during that time.[2] Reports

---

[1] Mother's fourth child, J, is also a child of father in this case. He was born during the pendency of this proceeding. He is not part of this termination proceeding. Father has an older child from a different relationship who is also not part of this proceeding.

[2] Washington State child protective services workers were involved with the family during that time in an effort to determine if mother's oldest child, A, could be placed in the home. He had been sexually assaulted by his biological father and presented too many difficult behaviors to make placement possible with these parents.

about the family from that time period characterize the home as minimally adequate and D as being well cared for.

In November 1998, mother and father had a disagreement. Mother left the family home with D, presumably to return some belongings to her brother, who lived in an apartment with his wife and another man, Flannery. While at her brother's apartment, which mother had planned to take a few hours, she became involved with Flannery, whom she had just met. She called father and told him that she intended to keep D with her and would not be returning home. She then moved in with her brother, his wife, and Flannery. Mother's brother is a convicted sex offender, and mother knew that fact. Mother and father thereafter engaged in a series of phone calls and contacts over the next two and a half weeks. D was with father part of that time. Mother testified at trial that, during that time, she was very careful about any unmonitored contact between D and her brother. The trial court found that testimony not credible, and I would defer to its finding because of its opportunity to view the witnesses and because of inherent contradictions in mother's testimony about that subject.

On November 4, 1998, while parents were separated, father obtained a court order restraining mother from having contact with him and granting him temporary custody of D. After father obtained the restraining order, parents had a conversation in which mother encouraged father to have the order vacated. Father agreed, and the order was vacated by the court. Mother had physical custody of D at that point. However, in an effort to get D back a few days later, father called the police, relying on the provisions of the vacated order. When the officer arrived, mother, with D, met the officer outside of the brother's apartment. As they conversed, the officer became concerned about D's condition. Even though it was a cold evening, D was dressed in a thin sleeper. Although the officer asked mother several times to take D inside, mother declined to follow the officer's suggestion. D also was very dirty and smelly, and it appeared that she had not been bathed in a long time. Her only bottle had mildew in it. Mother explained that she had not taken very many of child's possessions (among them, only six diapers) when she last left the family home. The officer contacted

SCF, and it directed her to take D into protective custody. Father was then arrested for misusing the restraining order. Thereafter, the juvenile court assumed jurisdiction over D, and parents became involved in a series of programs designed to enable them to regain custody.

The return of custody to parents never occurred. Although they fully participated in the programs required by SCF and in other forms of therapy on their own initiative, SCF came to believe that parents were unfit and were unable to apply what they had learned from the various programs. It sought termination of their parental rights on April 28, 2000. Trial on the matter began on July 14, 2000, 19 months after D was taken into custody. After hearing the evidence, the trial court ruled that SCF had not carried its burden of proof by clear and convincing evidence.

Because the trial court's reasoning and resulting conclusion is so starkly juxtaposed to that of the majority, I set it out in its entirety. The trial court wrote:

> "There is no question that both Mother and Father have deficiencies as parents. The episodic failings of both parents, as observed by various monitors of their visits with [D], make this clear. The dysfunctional families they came from, the lack of nurture they received as children, the absence of any positive parenting models in their lives and their intellectual and cognitive limitations make this also understandable.

> "This case originated with a single documented incident of neglect of this child, by Mother. This occurred in November of 1998 coincident with the parents briefly separating under conditions showing poor judgment on Mother's part. The child was very dirty, her bottle was unsanitary and she had a diaper rash. There was *no indication of abuse*, as distinct from neglect, of the child and there was absolutely no evidence presented of any abuse even occurring. The child has been in foster care for the ensuing 21 months.

> "The State has offered *no* evidence that this single incident of neglectful conduct, by Mother alone, was representative of how these parents had cared for this child during the previous fourteen months. The *evidence is in fact persuasively to the contrary*.

"During the fourteen months these parents had custody of this child the family had regular contact with Parrot Creek people and child protective workers from Oregon and Washington. The evidence was that the *family home was clean* and the *child was clean* and adequately cared for. The parents testified that they took the child to regular pediatrician appointments and *everyone agrees the child was healthy and developing* appropriately. The State offered no evidence from the child's pediatrician, nurses, neighbors, or anyone, that these parents were in any way neglectful of the child, or engaged in any conduct or created any condition that was seriously detrimental to the child.

"The State's response to the photographs [of child, parents and their home during the first 14 months of child's life] admitted as Respondents Exhibit 102 is that 'they don't show anything.' The State's response to its failure to show any significant deficiency in the parents' care of this child during these fourteen months is *'We don't know what kind of care was being provided'* and 'We don't need to wait for the child to be damaged' before stepping in. The poignancy of the latter statement cannot make up for the emptiness of the preceding statement given the State's burden of proof.

"The State's case for termination seems to be primarily based on the parents' psychological evaluations and the concerns of visitation monitors about the parents' ability to parent this child. Further ancillary support for termination is seen by the State in the parents' unstable living situation and their failure to 'adequately benefit' from the services SCF has provided.

"Starting with the implication of the psychological testimony; simply put the *evidence does not establish the presence of an 'Emotional illness, mental illness or mental deficiency* of the parent(s) of such nature and duration as to render the parent(s) incapable of providing proper care for the child for extended periods of time.' The predictive value of these assessments, in addition to their inherent limitations, is inadequate to support the State's position. *State ex rel Juvenile Department v. Johnson,* 165 Or App 147, 158-59[, 997 P2d 231] (2000). The prognosis of poor parenting and the State's argument that 'we all know that as children get older they become more challenging' does not provide the necessary immediacy of the claimed incapacity. *State ex rel Juvenile Department v. Wyatt,* 34 Or App 793, 797[, 579

P2d 889] (1978). The magnitude of this evidence is also significantly tempered by the *seemingly adequate parenting performed by these parents for the first fourteen months of their child's life.*

"The next broad category of evidence is that related to particular observed parenting deficiencies demonstrated during visits and the failure to sufficiently 'learn' skills through the services provided. Addressing first the issue of whether the parents benefitted from the services provided, the evidence is conflicting. Some witnesses felt there was improvement over time, particularly with Mother, though concerns continued to exist. Others felt there was no 'real' progress made. The parents believe they benefitted from these programs and *my review of the evidence convinces me that they made efforts to benefit from the programs they participated in and that they were at least modestly successful.*

"Given the functional limitations these parents have, perfection in parenting is not attainable, but neither is it required. To be allowed to retain their relationship with their child the parents must only be minimally adequate. All of us would be desirous of a society where every child received parenting and nurture at a level to which every parent should aspire, but the superimposition of such an utopian vision on a populace as diverse as ours would come at a price none of us should be willing to pay. SCF certainly should do all they are able to help parents, and thus help their children, to become the best parents they can be. SCF cannot, however, despite the most laudable motives, impose standards on parents that are not contemplated by constitutional, statutory and public policy considerations, *see State v. McMaster,* 259 Or 291[, 486 P2d 567] (1971).

"The use of service agreements is a helpful means of directing a parent's effort and gauging their commitment to their child. These agreements should create standards that are reasonably objective so that compliance or noncompliance is reasonably determinable. The service agreements signed by the parents in December of 1998 * * * are generally in that form and similar to the program established in Washington in connection with Mother's older son.

"Despite the seeming uniformity of expectations of these parents, as early as May of 1999 the Juvenile Court Judge in this County noted that *Washington authorities felt the parents were in compliance, but SCF felt they were not.* In

looking at the agreement, the only areas the parents had not previously complied with, is the requirement of stable housing and, arguably, the requirement of a verifiable source of income, although it is clear Father worked at least part time throughout the pendency of this matter. I fear that the conflict in the agencies' assessments of compliance is a product of SCF's expectations that these parents would be unable to comply, and not grounded in an objective assessment of the parent's actual commitment to this child.

"With regard to housing stability, the parents did live in a shelter facility in Vancouver, which was set up to accommodate children, for an extended period of time. No efforts were made to place the child with parents there on a trial basis and SCF did not provide any assistance in securing other housing. SCF points out the problem in providing housing assistance services without the parents moving back to Oregon, but oddly there seems to be little recognition of the parents' dilemma in trying to navigate the demands of two child protective agencies in two different states. One is left to wonder why jurisdiction over this child was not transferred to Washington so that a more unified approach to this family might be undertaken.

"Regardless of how the past compliance is characterized, at present *the parents have met all six requirements of the December 1998 service agreements.* Admittedly the stability of their current residence and employment is still unsettled, but this is not a situation where the parents have never been able to maintain a stable household. Though their living arrangements have been somewhat chaotic when they have not had custody of this child, when they did have custody of the child they lived in the same adequate residence for more than fourteen months. It is also significant to note that a history of unstable employment and living conditions cannot provide the sole basis for termination, although it may be considered where a child has a special need for stability. *State ex rel SCF v. Ettinger*, 143 Or App 418, 424[, 923 P2d 1290], *rev den* 324 Or 395 (1996) (Here there is no evidence of circumstances creating a special need for stability in this child, beyond our obvious desire that all children have reasonable stability in their lives.).

"In their subjective measuring of these parents' compliance with the service plan, *SCF seems to give no weight to the parents' efforts and commitment toward obtaining the return of this child.* The parents' interest in their child is a

very important consideration. *State ex rel Juvenile Department v. Harden*, 51 Or App 681, 687[, 626 P2d 944] (1981). For 20 months despite their recognized intellectual and social skills deficits, *these parents participated regularly in programs required by two states* and religiously attended two visits a week with this child. They constantly traveled from Washington to Oregon and Oregon to Washington to meet their obligations despite the difficulties this presented for them.

"I have the unsettling impression that the SCF workers never really believed that these parents would be able to mount the sustained, albeit somewhat imperfect, effort they mounted here. It appears to me that by the time of the second service agreement SCF had already committed to termination. The tone of the second service agreement, of autumn 1999, and its subjective focus on outcomes instead of discrete tasks is suggestive of a precursor for termination of parental rights, *not an effort toward assisting the parents toward reunification with their child.*

"At the time of these second service agreements Ms. Nash warned Parents about the seriousness of the situation given the length of time the child had been in foster care. After then being rebuffed by Ms. Nash as to Mother's view that 'they had done everything asked of them' and so should get their kids back, Mother made the observation 'you're going to take our kids and there is nothing we can do.' Given the context of this case and the efforts undertaken by Parents herein, this statement was chillingly prescient.

"Ms. Nash testified that the agency determined to move forward with termination based upon Dr. Ewell's evaluation. It appears more likely that Dr. Ewell's evaluation was requested because SCF had determined to proceed with termination proceedings. It is interesting to note that the evaluation was received by the agency less than a month after Mother had signed the service agreement and prior to Father signing. It is also interesting to note from the Introduction to Dr. Ewell's report that Ms. Nash had already painted a particularly bleak and hopeless picture of the parents for Dr. Ewell before he began any independent evaluation. It also appears that Dr. Ewell's evaluation fell on a day that the parents also had to be in Court in Vancouver in connection with another child. This may explain (or may not, the evidence is unclear) why Father refused to do the

lengthy individual evaluation and why Mother rushed through the MMPI without even reading the questions.

"I have above stated my assessment of the legal implications of the psychological evidence presented. As a final observation about the inherent limitations of these evaluations I note that Dr. Ewell found '[mother's] overall abilities, problem solving skills and capabilities to manage stress are extremely low. There is little evidence of a commitment to following through with personal responsibilities.' While I am sure that in some contexts that observation may be true, *in this case these parents have remained committed to following through with their obligations for twenty months, while juggling the myriad demands of agencies in two states under circumstances of greater stress than most of us ever deal with.*

"Getting back to the specific incidents observed during visits that are proffered as demonstrating the risk these parents represent to this child, I found the evidence *decidedly uncompelling.* Suffice it to say that the subjective interpretation of a number of witnesses about what clues the child was giving to the parents and the witnesses' subjective interpretations of the parents' expectations of the child is not very helpful in this context. Certainly the ability to understand clues from your child as to [the child's] needs and [the child's] developmental stages is an important part of parenting, but the *deficiencies perceived here are not so severe as to implicate the standards set forth by statute for the termination of parental rights.*

"The principal criticism of Mother *vis a vis* her observed visits with the child are that she seemed to 'direct the child's play' too much, she expected 'more of the child developmentally than was appropriate,' she would 'press the child to repeat words or phrases when the child was distracted or interested in something else' and that she lacked 'insight' as to the importance of the various skills that had been taught to her in parenting programs. Ms. Jenny Keys, the parent mentor, testified that the Mother did 'improve over time' and 'seemed to try to emulate' the witnesses 'modeling.' These observations and the generalized 'concerns' the various witnesses spoke of, are not sufficient to warrant termination of parental rights.

"The criticisms of Father are somewhat more varied. His personal hygiene issues and his sometimes angry,

sometimes disengaged, sometimes defiant attitudes toward SCF have made for less than harmonious relations. Had Father adopted a more congenial approach toward SCF, no doubt his life and that of the SCF workers would have been easier during this past 20 months, but ultimately of course, this is not a personality contest.

"In addition to the general concerns about the father's gruff manner and periodic remoteness from the child during the visits, there seem to be three incidents which the State points to as emblematic of his unfitness. These are the 'shit for brains' comments to the child, the 'punching motion' exchanges with the child and the swinging in the car seat episode.

"I will start with the least significant, the car seat episode. The description of the incident seems remarkably benign, yet the SCF workers acted as though the child was placed in great peril. There was no indication that the child was frightened, that the child almost fell out, that the seat was being so violently swung or at such height that there was some *real* potential for injury to the child, or that the Father would not have been able to react to protect the child if something unexpectedly happened. *From the testimony presented it seems that this was simply an incident of this Father playing with his child, making the child laugh, having positive interaction with the child, though not perhaps in a fashion free from all possible risk, and being then told by the SCF workers to knock it off.*

"This episode tells us more about the relationship between SCF and Father than about Father's parenting. The real problem the SCF workers had with Father over the car seat swinging was that Father did not do what they told him to do and did not react well to their threats to curtail visits. Father's small and somewhat childish rebellion resulted, in my view, in an exaggerated perception of the safety implications of this play. The most astonishing dynamic evidenced by this incident, and SCF's interpretation of it, is the apparent incapacity of the SCF workers to understand that Father might have some modestly legitimate frustration with their agency's domination of his life.

"From Father's perspective, as he testified, he 'has done nothing wrong for this to be happening.' This observation cannot be dismissed as the product of an unenlightened mind, it is in fact, strictly speaking, true. The child was

taken by SCF because of a situation created solely by Mother, and one which Father was attempting to remove the child from. *There has been no evidence presented by the State, and I assume if SCF had some evidence it would have been presented, that Father was deficient in any way as a parent during the fourteen months before his child was taken away from him.* The evidence suggests that instead of being sensitive to this position of Father and attempting to defuse his anger and frustration through empathy, SCF appears to have adopted, and retains, the view that Father's attitude demonstrates a lack of insight justifying their continued retention of the child and now justifies termination of his parental rights.

"Certainly it was not appropriate for Father to let his anger and frustration at times color his visits with his child. No doubt because of Father's compromised cognitive, developmental and emotional makeup this created more of a challenge than would be present for others, but the entire context, when considered, significantly mitigates these failings.

"Father acknowledges that he made the 'shit for brains' remarks, saying he was only kidding. This was certainly an ill advised and inappropriate joke, but as appalling as it may be, the fact is that remarks far more wounding are made to children by their parents every day without SCF intervention. That fact does not excuse Father's remarks, but as an isolated incident this evidence adds little to the State's claim for termination.

"The pretended punching is ambiguous in its implications. This may have been something that was part of Father's interactions with the child for the first fourteen months of her life. This behavior may well seem odd or strange to many people, but there is no indication that it was accompanied by any malevolent intentions or feelings. This 'pretended punching' may or may not have occasionally created confusion for the child. The sad reality is that the entire artificial construct of these brief twice weekly visits, with various monitors observing every move and utterance, creates a climate of awkwardness, anxiousness, defensiveness and potential confusion. This is not to say that these visits do not serve an important, but limited, purpose. It is only to say that it is not particularly helpful to isolate a few parenting blemishes at such visits without keeping in mind the context.

"In sum, SCF has seemingly expected these people to become someone other than whom they are. The Parents have personal limitations that have been discussed at length and which will always exist. The question is whether these limitations and deficiencies preclude these parents from being minimally adequate parents for this child. *The State has failed to prove that these parents cannot, and would not, be minimally adequate parents for this child.*" (Emphasis added.)

This case is governed by the provisions of ORS 419B.504 (1999). That statute provides, in part, that the rights of a parent may be terminated "if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504 (1999), as relevant to this case, also provides that, "[i]n determining such conduct and conditions," the court shall consider:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for extended periods of time.

"* * * * *

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

ORS 419B.504 was interpreted by the Oregon Supreme Court in *SOSCF v. Stillman*, 333 Or 135, 36 P3d 490 (2001). *Stillman* holds that,

"[f]irst, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that:

(1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' " *Stillman,* 333 Or at 145-46.

The focus in this case is on the first part of the inquiry defined by *Stillman.* In order to terminate parents' parental rights because the parents are "unfit," the statute requires us to find that they have engaged in some conduct or have some condition that is "seriously detrimental" to D. It is not enough for SCF to demonstrate that the juvenile court properly exercised jurisdiction over D in 1998 or that it should continue to exercise jurisdiction. In *State v. McMaster,* 259 Or 291, 303, 486 P2d 567 (1971), as well as in *Stillman,* the court emphasized that "we do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings that would enable the child to grow up as we would desire all children to do." *McMaster,* 259 Or at 303. In other words, transiency, incapacity to parent at an optimal level, poverty, or instability alone are not proper grounds for termination. Rather, the statute does not authorize termination so long as the parents' fitness to parent at the time of trial is minimally adequate. In the context of this case, that means that father and mother must be able to parent D at the skill level they demonstrated for the 14-month period before November 9, 1998.[3]

---

[3] The majority declines to draw the inference that, because the State of Washington did not intervene during this time period, mother and father must have been parenting adequately. It reasons that, "unfortunately, it is likely true that there are many parenting situations that would justify termination even before SCF intervenes." 181 Or App at 476-77 n 2. However, the record shows that the agency's nonintervention was deliberate. A therapist, Bufford, who worked with parents consistently during this time period said, "During that time, I felt that there was not sufficient indication to remove the child from the home." Additionally, as discussed below, the progress reports from mother's classes and

Washington state's child protective services agency made a conscious decision not to remove D from parents' home during the first 14 months of her life. A sampling of its family assessment reports of parents during that period includes the following entries. For September 26, 1997, the evaluator wrote, "[Mother] is at the best she has ever been. She appeared bonded with the baby, was breast feeding. She had consistent and early pre-natal care with clean UA's." On April 16, 1998, on a scale of "Great, Good, Mixed, Poor, and Uncertain," mother received grades of "Mixed" for participation and understanding of concepts. For May 8, 1998, the evaluator observed mother giving physical affection to D, setting clear limits (not to go too far away from mother, not to pull hair), talking to D, having eye contact with her "at least every few min[utes]," and putting herself at D's level. The evaluator concluded, "there was a lot of positive interaction-hugs, eye contact, etc." between mother and D. For May 21, the observer noted that mother "smiles at child," "praises child," "responds promptly to child's needs," "follows through with discipline," "uses affirmations with child," "avoids blaming and putdowns," and utilized "age appropriate methods of behavior management."

The record also contains dozens of pictures of D that were taken by parents in their home before SCF was involved with D. The pictures, while dismissed by SCF as showing nothing meaningful, in fact show that D had age-appropriate toys within reach, that she was developing appropriately, and reaching milestones such as crawling, walking, and drinking from a cup, and that D was clean, adequately fed, and suitably dressed. They also show that the family home was reasonably clean and that the family engaged in activities with D. Taken with Bufford's assessment that, in her professional opinion, there were insufficient reasons to remove D from the home at that time, it becomes clear from those facts that, if parents are able to continue to parent D in the way they did in her first 14 months of her life, there is not clear and convincing evidence of grounds for termination.

---

pictures of the family home and D during this time show that parents' ability to parent was at least minimally adequate.

To supplement its reliance on the incident on November 9, 1998, SCF essentially relies on four other instances of father's "conduct" that occurred after D's removal, to establish conduct or conditions that it claims meet its burden of demonstrating that return of child to the custody of parents will be "seriously detrimental" to D. I agree with the trial court's assessment of each of the three situations it discussed: (1) father's conduct of swinging D in a car seat,[4] (2) father's calling D an unpleasant name,[5] and (3) father's actions in pretending to punch D.[6] Those incidents standing alone or together do not demonstrate the kind of serious detriment that the legislature had in mind.

---

[4] The "conduct" in question is that, during visits, father would occasionally "swing" D in a car seat without restraining her. As the trial court found, there was no evidence of actual danger involved in the activity, and again, in the words of an eyewitness to the event, "he was—she was laughing, of course, because it was fun for her." When father asked, "Go again[?]," she repeated, "Go again, go again." Like the trial court, I agree that father's choice of that entertaining activity was not "free from all possible risk," but it did not scare D or impair her relationship with father, and it was certainly not grounds for termination of parental rights.

[5] Father greeted D with, and then repeated, the comment, "Hello, shit for brains." When questioned by counsel about that event, father testified that it had been intended as a joke, and that he realized afterward that D would probably not understand it to be a joke. Counsel then asked father, "How did you think that your daughter would feel about that? Did you think about that?" Father responded, "Afterwards, yeah, I did." He answered that he later thought, "It's my daughter. It was her looking at me and [asking], 'Dad, why would you say that to me?'" The court asked,

> "[w]hy didn't you say that when [counsel] was asking you about it. When [counsel] was asking you about it, you were kind of acting like it was just a joke and nobody should think anything about it. If you felt like you kind of screwed up there and shouldn't have probably said it and one of those things you wished you hadn't said, why didn't you tell us that when [counsel] was asking you those questions?"

Father replied, "I really didn't understand why he was asking it."

Other exhibits show that father exhibited pride in D's accomplishments. In my understanding of father's testimony as a whole, father had a difficult time getting past his resentment of SCF in order to acknowledge his shortcomings. However, upon the further questioning of the trial court, he was able to demonstrate that he now recognizes the wrongfulness of his words to D and, in any case, isolated comments such as he made, while ill advised and inappropriate, are not grounds for termination without a showing that they were seriously detrimental to D.

[6] The record contains several references to instances of father pretending to punch D. In context, the record shows that father's typical conduct was a general roughness or abruptness in his interactions with D, and that he would typically do things like suddenly jarring D's chair to startle her, or growl at her. However, those who observed such conduct stated, "[D] would end up laughing. It did turn into a game." Father himself acknowledged that "My growl is not a growl. I play with my daughter in a very strange way. It's just like my sense of humor is very strange."

The only other conduct on father's part that could be characterized as "seriously detrimental" conduct is his perceived inability by SCF representatives to interact with D in age-appropriate ways.[7] The record contains documentation of father "zoning out," leaving the room, dozing off during visits, ignoring or excluding D while providing care for the younger child, J, and having power struggles with mother in front of D that caused her to become a go-between for parents. Dr. James Ewell, a psychologist who performed an observation of mother, father, and D, testified that the most salient feature of the observation was the "emotional distance" he sensed between father and D. He testified that father "appeared to almost frown at his daughter" and he recalled that father clench[ed] his fist and put his fist near her face. Ewell testified, "I didn't think he was going to hit her. I wasn't concerned for her welfare. But that seemed to me to be an unusual form of greeting." Ewell also explained that he found remarkable the "emotional distance and the lack of nurturance and lack of affect from the father to the daughter." He also testified that father, despite obvious back pain, did get down on the floor and roll a toy back and forth with D.

In contrast to Ewell's one-time observations, witness Diane Staehnke, who supervised a number of parents' visits, perceived that father was "generally * * * very happy to see [D]" and that his "Hello, shit for brains" comment to daughter was "contrary to what I thought he felt for her." She testified that father's manner of interacting with daughter was to pretend to use his hand as a claw or as a fist and say, "I am going to get you." She conceded that "there were always good moments. I am not saying there weren't any good moments. They played together at the park outside."[8] It follows that the

---

The trial court found that this "conduct" was not seriously detrimental to D; instead, the trial court characterized it as a somewhat unnatural reaction to highly supervised, highly unnatural circumstances of interaction in a small, enclosed space. I agree.

[7] There was testimony about father's angry and hostile conduct toward social workers, including the fact that, when he heard child call her foster mother "mommy," he threatened to "beat the crap out of" a social worker. While such evidence is probative of father's tendencies in dealing with anger, it was not correlated in any way in this record to any effect on D.

[8] Much of SCF's evidence focuses on father's hostility toward its representatives, which, as the trial court recognized, may have made for an unpleasant time

evidence about father's ability to interact with D in age-appropriate ways is subject to conflicting reasonable inferences.

No evidence was presented at trial of any "condition" of father, such as drug or alcohol issues, or physical, sexual or other abuse issues, or mental deficiencies, except father's own admissions of a very challenging childhood. Father was diagnosed by Dr. Dudley, a psychologist. He found that father suffers from avoidant personality features, self-esteem issues, anxiety, and antisocial tendencies. However, Dudley did not testify that father's psychological condition, in itself, was dangerous or seriously detrimental to D. Instead, he explained that father's typical behaviors include a tendency to avoid others and to be uncomfortable in many situations. Dudley explained that, had father been in therapy, he would have him work on issues like reducing anxiety, not avoiding difficult or challenging situations, and increasing his self-esteem. Nothing in the record correlates those issues with the statutory requirements of ORS 419B.504. Ewell, who performed the parent/child observation discussed above, did not perform a psychological evaluation of father because father left before the evaluation was to begin. In conclusion, the record as to father is wholly inadequate to support a finding by clear and convincing evidence that either his conduct or his psychological conditions render him unfit to parent under the criteria of the statute.[9]

for father and the workers involved, but is evidence that is not sufficient to meet the requirements of ORS 419B.504.

[9] The majority views the import of the testimony about father's psychological conditions differently. *See* 181 Or App at 485. Apparently, the majority relies on the assessments of Deborah Baker, a marriage and family therapist, which occurred in December 1998, and on the assessment of Sharon Brewer, a counselor, who tested mother and father in April 1999. However, both witnesses made clear that father was "resistant to doing the assessment," or that he "deferred to [mother]" throughout the sessions. Baker acknowledged that she was not able to make diagnoses because she is not a psychologist, but she testified that "the mental health conditions [she] saw * * * are things that could be overcome with some counseling." Brewer reached her conclusion that father could not be a parenting resource for D based in part on "the difficulty in having him respond, first of all, to the assessments." With respect to the majority, there is no demonstrated nexus between father's difficulty or unwillingness to complete a psychological assessment and his ability to be a minimally fit parent. Also, those "assessments," to the extent that they were actually based on information provided by father at all, conflict with Dudley's evaluation done in July and August 1998. He found that father's conditions would not necessarily affect his ability to be a parent. Conflicting

SCF's evidence as to mother's conduct has more persuasive weight, in light of the statute's requirements. Although D was cared for adequately during the first 14 months of her life,[10] the events surrounding November 9, 1998, comment significantly on mother's fitness to parent on that date. The initial act of taking D to live for three weeks in the home of a convicted sex offender, without adequate diapers, clothing, or supplies, is an example of conduct, in my view, that is "seriously detrimental" to the child.[11] In addition, mother was apparently oblivious to D's welfare when the officer contacted her. After SCF took custody of D, there is evidence that mother allowed D to stand on a bookshelf to look into a mirror and that she allowed D to stand in a child's wagon that could have shifted and caused D to fall, but that conduct is hardly the kind of conduct that justifies the termination of parental rights under the statute. Because SCF did not ever attempt supervised visits in parents' home, there is no evidence showing that mother would engage again in the kind of conduct that occurred in November 1998. Ultimately, therefore, SCF's case turns on whether its evidence of mother's psychological conditions demonstrates that it is highly probable that conduct similar to what occurred in November 1998 will be repeated if custody is returned to mother and father.

SCF asserts in response to the above issue that "mother and father cannot be minimally adequate parents for their child or for any other child." It explains:

---

psychological evaluations about fitness for parenting will rarely give rise to clear and convincing evidence, absent a clear reason to completely disregard one side of the conflicting evidence. *See, e.g., State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991). Here, the majority offers no reason to disregard Dudley's opinion in favor of the other assessments.

[10] There is conflicting evidence to the effect that child may have been left in a high chair or on the floor for an undue period of time, with a TV remote to play with, while mother played Nintendo for long periods of time. That conduct allegedly occurred during the time child lived with parents and, as discussed above, child's overall condition was not sufficient to trigger intervention by the State of Washington.

[11] I agree with the trial court that such an incident, standing alone, would be insufficient grounds for termination. However, mother's failure to recognize or appreciate the danger that her conduct created, both at that time and at trial, makes the conduct more troubling. Mother persisted in her belief, even at trial in this case, that her brother had been wrongly convicted. Father, on the other hand, acknowledged that, although the convicted sex offender was D's uncle, he could pose a threat to D.

"In spite of least four parenting programs, and many other services, parent trainer Schafte testified that mother and father could not safely care for [D] without 24-hour monitoring. According to Linda Mulherin, even visits must be monitored at all times. The state is not required to provide foster care for the parents to enable them to care for the child. * * * Even if the state were required to provide that level of assistance to these parents, there is no evidence that they would cooperate or that their parenting would be improved by it; they resisted hands-on assistance by Jenny Keys and Linda Mulherin, for example and did not benefit appreciably from this mentoring." (Citations and transcript references omitted.)

In short, SCF contends that, because of mother's conditions, "none of the[ ] services had any appreciable effect on the ability of" mother to provide adequate care for D.

In support of its assertion, SCF relies, in part, on the psychological evidence testified to by Dudley and Ewell. Before Ewell conducted the observation of mother, father, and D, SCF provided information to him that tended to convey SCF's perspective of the family. For example, Ewell was told that mother and father have a "long history with the agency," these parents "have participated in a variety of services," and that "neither [parent] seemed capable of demonstrating 'any skills that they had been taught.' " He was also told that "their behaviors and 'lack of social conscience' were of utmost concern" and that "both parents had experienced terrible childhoods and most likely endured significant damage to their own development." Ewell diagnosed mother with conditions that include mild mental retardation, post-traumatic stress disorder, adjustment disorder, and a personality disorder. Ewell concluded that, "she would certainly not be considered amenable to any form of treatment" and "there is little evidence of a commitment to following through with personal responsibilities."

Dudley performed evaluations of mother at the request of the State of Washington's child protective services agency. In his evaluation, Dudley noted that, "compared to her previous assessment, some improvement in her judgment and overall functioning is suggested and antisocial trends are less evident." He concluded that she continues to

have cognitive limitations, attention deficit hyperactivity disorder, post-traumatic stress disorder, and a personality disorder. Dudley testified that, when a person has the above conditions in combination, the conditions "could affect any one, any of the number of areas of functioning, not just parenting." When asked to assume that mother had not benefitted from the services offered to her and to give an opinion on her fitness to parent, he opined that her "prognosis is poor." Unlike Ewell, Dudley opined that "[mother] impressed this examiner as being relatively willing to accept services offered to her."

Some of the consequences of mother's conditions, in the view of Dudley and Ewell, are difficulty in managing anger and impulsiveness, a limitation in mother's ability to feel empathy and to perceive D's verbal and nonverbal clues as to her needs, and an inability to adapt her own behavior to put the child's needs first. For example, when asked to give an opinion about what mother's conditions mean regarding her "ability and future ability and prognosis to parent a child," Ewell answered, in part, that mother's mild mental retardation "does not preclude a person from parenting, but it certainly does suggest that he or she [will have] issues of raising children." Ewell said he was "surprised at the lack of insight that I saw from a person who had gone through programs of intervention." Later, he testified that "there was a sense that the responses that she gave—sounded like response that might come out of a parenting class. * * * I didn't have a sense of application." Ewell, when asked about a written summary that he had provided to a caseworker, said that he did not consider mother "to be a viable placement resource for her children" and that her prognosis was "poor." He explained that his opinion was based on his assessment that she lacked insight, that she was "quite angry," and that she had limited cognitive ability. Ewell concluded from his evaluation that mother did not have the ability to provide a stable, predictable, loving and nurturing environment for D and "that there would be a strong risk of some emotional traumatization to the child because of [mother's] conditions[.]"

In predicting a poor prognosis for change, Ewell and Dudley relied on the assertion by SCF that mother had not

improved her abilities or functioning despite extensive parenting training and services; thus, the validity of their prognoses necessarily depends on whether the picture of mother portrayed to them was accurate. Moreover, to the extent that Ewell did not rely on SCF's written background information, his and Dudley's prognoses in the abstract should be tested against the evidence of whether mother had, in fact, improved her parenting skills and abilities after November 1998. Ewell evaluated mother once. In contrast, Dudley recognized some improvement in his second evaluation after evaluating mother over a period of time. Because the expert testimony is subject to conflicting inferences about whether mother is capable of parenting and of improving her parenting skills, *State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991), I turn to the evidence of mother's state of functioning and her responsiveness, or lack thereof, to the training and services she has received.[12]

In its brief, SCF relies primarily on the testimony of Donna Schafte, Linda Mulherin, and Jenny Keys. At the time of trial, Schafte worked for Clark College in Vancouver, Washington, as a parent educator in a program for parents referred to it by the Washington State Department of Services and Human Resources. Her role was to meet with parents to talk about child guidance and anger and stress management and to promote understanding of how children develop. Schafte met with father and mother for ten weeks,

[12] The majority says that "[mother] is incapable of appreciating risks to D's safety and places in unsafe situations; she has subjected D to chaotic and dangerous living conditions, and she neither understands nor pays sufficient attention to D's physical and emotional needs." 181 Or App at 485. The majority implies that the "placing [of D] in dangerous conditions," the "subjecting [her] to chaos and danger" and mother's "inattentiveness" is ongoing. However, the evidence does not support the majority's assertions. The evidence can be divided into two time periods: the first 13 months of D's life and the time period when D was in foster care and mother had no opportunity to take care of D. As discussed more fully below, the evidence is in conflict regarding mother's fitness to parent during those time periods. During the first period, the State of Washington made the calculated assessment that it was not necessary for D's protection to remove her from the family home. It was a single event that prompted D's removal from the family home. During the second period, the most serious evidence that can be mustered against mother about her care for D is that she allowed D to stand on a raised object to look into a mirror and that she allowed her to stand in a wagon that could have rolled and injured her.

beginning in January 2000, for a weekly two-hour class. She was asked by SCF's attorney:

"[Q]  Were the [mother and father] able to benefit in any significant way from your program?

"[A]  Absolutely, we saw a real turnaround, change of attitude, maybe the fourth week of class. The first few weeks were really tough. We were bucking along with resistance. We saw a turnaround. They continued to come very faithfully. They received certificates. So their attendance was very good."

Later, Schafte stated:

"But the part that I saw in the parenting sessions with the parents was that cooperation, communicating with other parents, talking about the material and information that was covered, that kind of thing."

When asked about parents' "ability to be parents at * * * [t]he point they left [her] program," Schafte responded, "Well, again because I didn't see them interacting with the children very much at all, that's a little more difficult for me to evaluate." When asked if either parent improved his or her ability to understand child development, Schafte said,

"[Mother], all long, you know, was able to share and talk. I think she's had a lot of background before this. The impression I got, really knew a lot of the terms and seemed to have some knowledge already of the parent education. [Father] was very quiet in most of the parenting classes, but he became more cooperative as time went on, at least in my portion."

Counsel for SCF appears to have realized at that point that the witness' testimony was not favorable to his client. He reminded the witness of a phone interview that she had with an investigator for SCF. He asked:

"Do you remember telling him[, the investigator,] that, '[mother and father were] one of the most difficult couples [you have] had the misfortune to teach,' in your 28 years of teaching?"

Schafte answered:

"I didn't say 'misfortune,' but I did say that—in fact, that's when we had the talk with them because I wasn't willing to

continue with that resistance. It was just taking too much energy from the other couples in the class. They were very difficult to deal with. And we told them that as well. But I did not use the word 'misfortune.' We were really happy to see the change in attitude."

Again, counsel reminded the witness of her conversation with the investigator:

"[Q]   Did you remember him asking you if you thought that [mother and father] would make good parents * * * ?

"* * * * *

"[A]   If they would make good parents? Yes, I guess so. He probably did phrase that. I don't remember the term exactly.

"[Q]   Do you remember what you said?

"[A]   From my conversations with the other instructors, we felt they needed a lot more support, and we would not recommend that at this point without a lot of support.

"[Q]   Do you remember saying—

"[A]   We would worry about the children's safety. Pardon me?

"* * * * *

"[Q]   Did you also indicate that the parents are too into themselves to be parents?

"[A]   Oh, I don't know, again, if that's the term that I used, but yes, I believe that they both need an intense amount of therapy and help to work through their own issues."

On cross-examination, Schafte testified that "[parents'] attendance was excellent. They really put forth great effort. They were there on time, stayed through the whole class." When asked about the ability of mother and father to understand the information being given to them, Schafte volunteered that, as to mother, "it seemed like she had a really good handle on what we were talking about. [Father] was more quiet, more withdrawn during that time." Schafte said generally that mother and father "had made some progress and had benefitted some from the program." Counsel then asked:

"And you indicated that if they were going to be parenting in the home, that they would need some support. What type of support would you—do you feel that they would need?"

Schafte answered, "Did I say that?" Counsel responded, "You tell me." Schafte answered, "Tremendous amount of support. I would almost say a live-in, someone there consistently to begin." Counsel inquired, "Someone to check up on them on a regular basis?" Schafte replied, "Absolutely."

On redirect examination, counsel for SCF asked:

"Did you also indicate that you were afraid that they would bomb your house because of the anger and rage they possessed?"

Schafte answered, "I said that flippantly. And I am sorry that that came through. I said that to [the investigator] just in a flippant manner because of the anger problems that I saw." On re-cross, Schafte conceded that mother and father had never made any threats to her and that any conflict that she observed occurred between them and was not directed toward D. In light of Schafte's inconsistent testimony, there is little weight to be accorded her opinions about mother's future fitness as a parent.

At the time of trial, Linda Mulherin was a home support specialist for the State of Washington. She was assigned to assist mother and father in their parenting skills with D during their visits with her beginning in January 2000 until the time of trial. The visits occurred twice a week, and each visit was one and one-half hour in length. Then about a month before trial, SCF reduced the parents' visits with D to once a week. Based on her supervision of those visits, Mulherin testified that she had concerns about father's and mother's parenting abilities. She explained,

"Well, I think that in [mother]'s efforts to show that she has learned certain parenting skills in classes and things, she discusses them. She'll say, 'I have learned this or I've learned that' and then she'll—in trying to sort of follow through or demonstrate that, she'll be real rigid, for example—rigid but inconsistent."

Mulherin gave an example to illustrate her concern.

"When [mother] would want [D] to do a certain thing and it might be to say the ABC's or count * * * and [D] wanted to do something else, and [mother] was, like * * * kind of force her to kind of go through—just go through certain routines instead of having it to be fun and kind of a natural learning experience. It's more of a demanding thing."

Mulherin also testified that, "[a]t certain moments, [mother]—and I am not going to say she didn't generally— she didn't ever notice what [D] wanted. There were lots of times when she did." When asked about mother's use of discipline during the visits, Mulherin replied:

"There were times when [mother] did good redirection as far as if [D] was trying to get something of [J]'s, for example, and she didn't want (tape inaudible), she would find something else. * * * I would like to see a little more active diversion kind of thing where you get up and go to the child and you say, 'Did you see this,' or whatever. And that's the kind of thing I would model * * * the preferred method really. would be * * * providing an alternative for it[.]"

When asked by SCF's counsel whether mother would "yell" at the children, Mulherin responded, "I didn't see her as a—yell, not at the children. I saw her get angry [with father] a couple of times." When asked whether the lessons being learned in the parent training were actually being applied, Mulherin said:

"I didn't really notice that the kind of techniques that I teach when I am teaching the parenting class or doing the actual parent training, I didn't notice them using those techniques and skills."

Mulherin continued, explaining that when mother asked her to tell her if she was doing something wrong, and Mulherin did, "on a couple of occasions * * * she would get pretty angry * * * and say, 'that's not what they told me in the other class.'" Mulherin described disagreements with mother over D not wearing earrings because mother was concerned that her pierced ears would close up. Mulherin said, "after a few weeks of this, [Mother] did finally,—I guess I could say, dropped the subject." Counsel asked if there was anything else that the witness wished to describe concerning mother's "understanding of the needs of the child[.]" Mulherin described how mother would sit and rock J and wanted to

rock D on a couple of occasions, even though D didn't want to be rocked. She concluded, "That's what I mean by activities were geared more to meet the needs of the parents."

On cross-examination, Mulherin testified that she had not seen any progress over the last six months and that the parents' visits with D were still supervised. She said that D was "eager" to see her parents during visits, and she was unaware of the reason why the visits with D had been reduced. She commented on mother's parenting skills,

> "[a]nd as far as the skills, I am not saying that [Mother] doesn't have parenting skills. She knows them. She can tell me all the right things. It's simply a matter of applying them. So, I am not saying that she doesn't do that."

Mulherin concluded that mother was a "strong, loving" parent, but "I don't know about [father]." She conceded that she had never seen mother at home with D because the visits always occurred in a state office or facility. SCF did not conduct a redirect examination of Mulherin.

The third witness on whose testimony SCF relies to demonstrate that mother and father cannot be minimally adequate parents for D or any other child is Jenny Keys. At the time of trial, Keys was a parent mentor employed by Parrot Creek Child and Family Services. She worked with father, mother, and D from March 1999 until December 1999. She was with parents while they had two visits per week with D at an SCF facility during that period of time. On direct examination, Keys testified that, when she first started working with the parents, "[mother] was pretty resistant. She seemed pretty angry and threaten[ed]. She wasn't very receptive or open to information or just my presence[.]" Keys said that mother's responsiveness improved over time. However,

> "[i]t seemed hard for [mother] to stay focused, particularly after [J] was born. They really struggled to divide their attention, and it seemed really hard for her to read [D]'s cues."

Keys perceived mother as giving inconsistent directions to D and attempting to control D's play during visitations. Mother

and Keys disagreed about whether D was developmentally ready for certain activities. Keys said that, toward the end of her experience with father and mother, "there was a lot of positive stuff" because mother would try to emulate Keys's behavior. SCF's counsel asked, "Was there a concern about her ability to continue that after you stopped working with her?" Keys answered, "Yeah, I mean, it was short term, and I would have a concern that she wouldn't be able to identify those things on her own." Counsel asked, "[I]n your estimation, are either of these parents able to successfully take care of [D]?" Keys did not directly answer that question, responding instead about her concerns regarding father's safety choices.[13] Keys stated that she saw little improvement in mother's ability "to meet the child's needs on her own," although she conceded that she "occasionally" saw an ability on mother's part to carry over the things she learned from one session to the next. Keys concluded:

> "Positively, one of the last visits that I had with her, she became visibly upset with [D] told her no or—no, refused to follow directions, which—it was very difficult behavior for her age. [Mother] was able to hold it together and actually asked, after the visit was over, how she could handle it different."

On cross-examination, counsel pointed out that Keys had written in a March report that "[b]oth [parents were] receptive" to the information and suggestions that Keys had given them.

As stated above, the weight to be accorded to Dudley's and Ewell's prognoses for change, and to SCF's projections that mother's psychological conditions will continue to render her unfit to parent, depends in large part on whether mother's behavior and performance have in fact improved in response to the parenting training and services she has received. Certainly, SCF can point to the events surrounding November 1998 to show poor judgment on mother's part. However, the failure to remove D from the family home

---

[13] Keys answered that her concerns were "choices, safety choices that they have made." She then referred to the choice of father to swing D in the car seat, discussed above. *See* 181 Or App at 507 n 4 (Edmonds, J., dissenting).

before November 1998 and the other evidence in the record belies SCF's assertion that mother was unable to provide minimally adequate care before that time.[14]

The trial court found that mother "made efforts to benefit from the programs [she] participated in" and that she was "at least modestly successful." Besides the testimony in the record to which I have already referred, there is additional testimony that supports the inference that regarding her parenting skills, mother is capable of change.

Kathleen Bufford, a marriage and parental therapist, worked with the family during the first 14 months of D's life, while D still lived with parents. Mother had come voluntarily to the program for which Bufford worked. Bufford testified that, during the 14 months that father and mother had custody of D, they had regular contact with representatives of the states of Oregon and Washington, the family home was clean and D was generally clean and adequately cared for. Bufford's closing summary indicates that mother had successfully completed the parenting program and that, in regard to understanding a child's development, she had

"[a]chieved a number of goals related to understanding child development, behavior, emotional management, and improved her bonding skills by practicing eye contact, positive verbal communication."

As to mother's progress after taking Bufford's program, Bufford testified, "And it seemed to me that [mother] was, first of all, for a mom to learn that she needed to make eye contact. And in that respect I felt that [mother] had made progress." She was asked, "You noticed progress in her ability

---

[14] It appears that SCF is relying, as the trial court suggested, on its trial counsel's assertions that "the first 14 months of the child's life are not particularly [in]formative as to how the parents are going to be able to handle that child once the child starts to develop more challenging behaviors," and "we know by simple— by common knowledge [t]hat babies don't move around as much. They don't get into things. They don't—they're not as difficult to handle. It's once they start maturing a bit. And that is when—that is more challenging." That reasoning is not very persuasive, first because the parenting of an infant can be a difficult endeavor, and second, because SCF's own witnesses and exhibits show that mother had learned to some degree how to adjust her behavior and expectations to the child's developmental level.

to make eye contact," and she answered, "Yes." She explained her concern:

"I felt that in the lab situation [mother] displayed minimally adequate parenting. But I had grave concerns about what would happen within the next year as the child learned the word 'no' and as she learned to pull away from Mom rather than receive hugs from Mom, holding from Mom."

On cross-examination, Bufford was asked, "You felt that [mother] was, in fact, demonstrating, at least minimally adequate parenting skills?" and Bufford answered, "She was learning minimally adequate parenting skills. And by the end, in lab *she was demonstrating those skills.*" (Emphasis added.) Bufford concluded:

"What I found encouraging was her ability to relate well to me. And I felt that *she had made progress in terms of her ability to relate well to other adults, such as the other* parent educator, and in her desire to do what she needed to do, her desire to parent well and her confidence[.]" (Emphasis added.)

Melissa Brown, a mental health therapist, worked with mother for 13 weeks in anger management therapy. She testified:

"I think initially, when she came for the initial sessions of therapy, she seemed to have difficulties with her anger. When I saw her the subsequent sessions, several months later, *she seemed to have made quite a bit of progress in handling anger.* * * * She seemed more able to utilize techniques that we talked about for managing anger such as time-outs and conflict resolution." (Emphasis added.)

Brown said that "it's hard to make many changes in a short period of time." Although she acknowledged that she had concerns about mother's ability based on her "limited cognitive ability which make[s] it more difficult for change to be sustained long-term" without additional counseling, Brown explained that mother had expressed an interest in continuing the services after the 13-week session ended but was unable to do so financially.

In essence, SCF's entire case against mother focuses on its continuing concerns about mother's ability to apply

what she has learned. Mother has met all of the requirements of her service agreements, she has made *bona fide* efforts to benefit from the programs she participated in and, as the trial court found, she and father were at least modestly successful in those endeavors. It is noteworthy that almost all of the care providers who had repeated interactions with mother, especially Bufford and Brown, said consistently that mother made observable improvements over the duration of their services, that she was incorporating their suggestions in her care of the child, and that she was amenable to more parent education. The evidence of mother's inability to change, therefore, is subject, at least, to conflicting reasonable inferences.

In my view, those conflicting inferences prevent SCF from carrying its burden of proof by clear and convincing evidence. When the evidence of parents' efforts and moderate successes after November 1998 is combined with the evidence of their minimally adequate care for D before she was taken into custody by SCF, it is impossible to conclude that SCF has proved by highly probable evidence that father's and mother's parental rights should be terminated. On this record, the trial court wisely ordered that SCF immediately begin good faith efforts to reunite D with father and mother at the earliest appropriate time with appropriate safeguards for D's welfare. It may be that father and mother will be unable to adequately parent D in the future, but until they are given more of an opportunity than was afforded them by SCF since November 1998 to demonstrate that they can apply what they have learned, no one will know if that is the case.

For those reasons, I dissent.

Landau and Armstrong, JJ., join in this dissent.