Argued and submitted June 2, reversed August 4, 2004

In the Matter of
Fey Ruelas-Tuttle, a Minor Child.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

Jose Jaime RUELAS-REYES,
*Appellant.*

00J0839; A123308

95 P3d 733

Phillip Wiseman argued the cause and filed the brief for appellant.

Ryan Kahn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

### HASELTON, P. J.

Father appeals from a judgment terminating his parental rights to his three-year-old daughter, F. ORS 419B.500 (2001).[1] On *de novo* review, ORS 419A.200(6)(b) (2001), we determine that the Department of Human Services (DHS) failed to prove by clear and convincing evidence either that father was unfit, ORS 419B.504 (2001), or that father had neglected F, ORS 419B.506 (2001). Accordingly, we reverse.

Father, a citizen of Mexico, and mother, an American citizen, were married in Nevada in 1997.[2] Their first child, M, was born in Oregon in January 1998. By that time, parents' relationship was deteriorating because of mother's substance abuse, petty theft, and promiscuity. In April 1999, father pleaded guilty to fourth-degree assault for having assaulted mother during a domestic dispute. Father was placed on probation. However, father violated the terms of his probation by failing to attend the "Solutions" anger-management program, and, in February 2000, a warrant issued for his arrest.

In early 2000, after the arrest warrant issued, father decided to return to Mexico. His relationship with mother was irretrievably broken because of her substance abuse and frequent absences, and father was concerned about M's well-being and safety if M remained in this country with mother. Accordingly, father arranged with his mother, Ana Marie Ruelas, to bring M to Mexico to be reunited with father. When father left for Mexico, he did not know that mother was pregnant.

On June 25, 2000, mother gave birth to F in Salem. Father, who was living in the Mexican state of Colima, had first learned of mother's pregnancy about a month earlier but

---

[1] In 2003, the legislature enacted an omnibus revision of the juvenile dependency code. Or Laws 2003, ch 396. However, the termination trial here occurred in August 2003, before the effective date of the revision, January 1, 2004.

[2] The record does not disclose father's immigration status at that time. However, the record does indicate that, at the time father decided to return to Mexico in early 2000, he was in this country lawfully pursuant to some category of work permit. That permit subsequently expired sometime before March 2002.

believed that the child was, almost certainly, not his. However, when Ruelas saw F a few weeks after her birth and informed father by telephone that she believed that F was his child, father accepted that and never disputed paternity.

On September 27, 2000, DHS filed a dependency petition, alleging that mother's substance abuse and criminal conduct by mother's domestic partner (not father) required that F be placed in foster care. That petition also alleged that "[t]he child's father is out of the country and is unavailable to parent." At the same time, the court granted mother's petition for appointment of counsel.[3] Shortly thereafter, the juvenile court placed F in foster care with Ruelas, the paternal grandmother. Following a jurisdictional hearing in mid-October, the juvenile court took jurisdiction of F, continued her placement with Ruelas, and ordered mother to undergo substance abuse treatment and to complete parenting training.

In mid-November 2000, DHS sent a letter to father in Mexico, enclosing a copy of the service agreement between mother and DHS and asking father to provide any information he might have pertaining to F's medical history. Father did not respond to that letter. DHS did not communicate with father again until August 2001.

In late November 2000, Ruelas contacted DHS and said that she wanted to return to Mexico to visit her mother (F's great-grandmother), taking F with her. DHS initially consented but then refused permission after mother objected, telling DHS that Ruelas had taken M to Mexico without her consent. In early December, Ruelas left for Mexico, and DHS placed F in foster care with a family with whom she would live for the next 11 months, and for 30 of the 32 months until the termination trial in August 2003. It is unclear from the record how long Ruelas remained in Mexico, but she returned to Oregon no later than the spring of 2001.

From late 2000 through 2001, DHS continued to work exclusively towards reunification with mother, without

---

[3] As amplified below, no attorney was appointed for father until September 2002, nearly two years after F was placed in foster care. *See* 194 Or App at 403.

any consideration of placement with father. Meanwhile, however, in April 2001, DHS sent letters to various of father's relatives, including Ruelas and father's sister, Theresa Gonzales, asking if they were interested in acting as temporary or permanent foster parents for F. Gonzales responded affirmatively and submitted the requisite information to DHS. However, DHS lost Gonzales's submission and failed to inform her of that loss until she called the caseworker seven months later. When Gonzales resubmitted her application, the agency informed her that her application was untimely and that the agency had decided to proceed with adoption as the permanent plan.

June 25, 2001, was F's first birthday. Ruelas hosted a birthday party for F at her home in Salem, with all of father's family in Oregon attending.

In the summer and fall of 2001, mother continued in treatment and appeared to be making progress. As the agency prepared to return F to mother, the caseworker, on August 6, 2001, sent a letter of expectation to father in Mexico.[4] That letter stated that F was in foster care and, if father wished to be considered as a placement resource, he must contact the caseworker "not later than one week" after the receipt of the letter and thereafter "maintain contact with your caseworker to plan for [F's] future." Conversely, the caseworker agreed to "keep [father] updated on [F's] needs and progress," to "advise [father] of case progress and planning," and to "refer [father] to services as needed."

On September 21, 2001, father called the DHS caseworker in response to the August 6 letter of expectation. That was father's first personal contact with DHS, and F was nearly 15 months old at that time. Father told the caseworker that he would not be returning to the United States because he was "not legal." Father also told the caseworker that he "wanted to be notified if the mother did not get the child back because then he would want to be a resource." Father gave the caseworker a phone number where he could

---

[4] Two versions of the letter, one in English and the other in Spanish, were mailed separately. Father signed certified mail receipts for the letters on August 27, and September 10, 2001.

be reached. The caseworker did not seek any additional information from father because, at the time of their conversation, the plan was to return F to mother.[5]

On September 30, mother gave birth to another child, A, who was F's half-sister. A little over a month later, DHS returned F to mother's care. Roughly two months thereafter, on January 23, 2002, DHS placed both F and A with F's original foster family because of the condition of mother's residence and because of an outstanding criminal warrant against mother.[6] At that point, F was 19 months old. Until then, DHS had never considered placing F with father; the agency's focus had been exclusively on mother.

Meanwhile, in Mexico on January 5, 2002, father had married Ana Julia Sosa. On February 11, DHS sent a letter to father at Ruelas's address in Salem, telling him that it was "very important" that he contact the caseworker, Emily Keys, concerning "a court hearing which may result in a termination of your parental rights." No copy of that letter was sent to father in Mexico. However, on the same day, DHS sent a letter to the Mexican consulate, seeking assistance in locating father and consulting with him with respect to plans for F.

On March 12, 2002, in response to DHS's February 11 letter and because his family had told him that mother was failing to meet the conditions for F to be returned to her, father returned to Oregon. By that time, father's work permit had expired, so his entry into the United States was unlawful. Father contacted DHS and left a message for the caseworker, Keys, asking her to arrange for visitation.

The next day, father, Ruelas, and Gonzales met with Keys to discuss F's future and possible placement with relatives. During that meeting, father told Keys that he wanted F to be placed with him and, if that was not possible, he hoped that F would be placed with Gonzales. Keys told father that, before F could be placed with him in Mexico, a home study would need to be performed and that DHS would take steps

---

[5] Father also told the caseworker that mother had sent him dissolution papers and that he had signed and returned those to her for filing.

[6] A was later placed with her father.

to initiate such a study and make sure that it was completed. Keys assured father, and he understood, that, if the home study was favorable, F would be placed with him in Mexico. At the end of the March 13 meeting, Keys, who understood that father would be returning to Mexico within days, agreed to set up a visit for the next day. She also agreed to prepare a letter of expectation for father, outlining father's obligations, which would be provided to father when he saw F.

Keys did prepare a letter of expectation, as well as a cover memo. The letter stated that father was to maintain contact with Keys and inform her of any change of address or telephone number, that father was to "take part in all court hearings,"[7] and that he was to

"[m]aintain contact with [F] by sending letters to your case-worker that she can read to [F]. Also send her pictures of yourself to help her remember what you look like. We want to help you and [F] grow closer."[8]

In her cover memo, Keys stated that she thought father had "taken care of all the important things you can do for now." Keys wrote that DHS would complete a study of Gonzales's home for purposes of temporary placement "as quickly as possible" and would keep Gonzales "updated on the progress of the study."[9] Keys continued:

"I have to speak to some attorneys before I can give you more information about what you personally need to do next and what it will take for [F] to come live with you in Mexico. It may take several weeks to find this out. But I will call you or send you letters, and tell your family members (so they can get in touch with you, if I have difficulty doing so) about what you need to do next as soon as possible."

---

[7] In the letter, Keys assured father that "I will investigate whether you have an attorney assigned to you and if he/she can participate in hearings on your behalf." There is no indication in the record that Keys ever undertook such an investigation, much less that she informed father of the result. As noted, the juvenile court did not appoint counsel for father until September 2002.

[8] There is no indication that father was given the foster family's address or telephone number. Accordingly, all communications were apparently to be through the caseworker, Keys.

[9] There is no indication in the record that DHS performed any study of Gonzales's home.

Father received both the letter of expectation and the cover memo on March 14, when he arrived with Ruelas and Gonzales to visit F. That was the first contact between father and F; she was then nearly 21 months old. During that visit, F's foster mother took pictures of father, telling father that she was doing so in order to "show [F] who her father was." Father returned to Mexico a few days later.

On April 17, 2002, a month after father's visit, Keys wrote to the Mexican consulate in Portland requesting assistance in obtaining an assessment of father's home in Mexico. That letter did not indicate that time was of the essence. There was, apparently, no further followup or communication between DHS and the consulate regarding the home study until June 18, 2002, two months later. Meanwhile, on May 10, Sosa gave birth to F's half-brother, E, in Mexico.

On June 18, 2002, the Mexican consulate informed DHS that it had requested an agency to provide a "Social Economic study on [father] and once we receive the results, we will promptly notify you." Three days later, Keys spoke with Ricardo Medina of the Mexican consulate, pressing for prompt completion of the home study. Keys's concern was motivated, in part, by the fact that, notwithstanding mother's previous failures, DHS had continued to work with her but "there were, again, concerns about mother's progress and ability to be an actual placement resource." Medina informed Keys that father "had denied the home study at first," and Keys asked Medina to talk with father and impress on him that, without a successful home study, F could not be placed with him. Medina agreed to do so.[10]

Father did, in fact, initially decline to cooperate with the home study. When he was first contacted by the evaluator, father believed that the apartment where he was living was too small and was not in a nice area, and that the home study would be unfavorable. He asked for additional time to move to a more suitable home. Father did move; ultimately, the home study was conducted and completed about a month

---

[10] At the termination hearing, Keys acknowledged, on cross-examination, that, at that time, "the only thing [DHS was] really waiting for was the home study."

later; and, as recounted below, the study's placement recommendation was favorable.

June 25, 2002, was F's second birthday. Again, father's family in Oregon attended her birthday celebration. Father did not send F any card or gift. Indeed, father had not sent F any cards, letters, or photographs through Keys—and he never did. At some point, when father's sister, Gonzales, visited Mexico, father gave her some photos of his family to share with F. The record does not describe when that occurred.

On July 2, 2002, Keys informed a Citizen Review Board panel that, although father had initially denied the home study request, "he has since cooperated." The Citizen Review Board found that DHS's goal was to "return child to parents," and that "progress has been made to alleviate the need for placement." The next day, and without having communicated directly with father since March 13, Keys sent father a letter stating that DHS intended to file a termination petition.

Keys's July 3, 2002, letter began by announcing the agency's intent to file a termination petition. It then stated that father should contact his attorney immediately and, if he did not have and could not afford an attorney, he could contact the juvenile court and request appointed counsel.[11] The letter continued:

> "Because DHS is seeking the termination of your parental rights, I will no longer continue to offer reunification services to you. If you wish to be referred to additional services, have your attorney contact me. Enclosed is the most recent court order/letter of expectation which sets out what you need to do.

> "There may be options available to you in planning for [F's] permanency. I encourage you to first contact your attorney if you would like to discuss these options further.

---

[11] The letter gave the court's address but did not provide any telephone number.

"From this point on, I cannot talk to you about your case. You will need to contact your attorney before you contact me. If you want information about the case, contact your attorney or the juvenile court."[12]

DHS made the decision to proceed with termination and possible adoption, notwithstanding that it was awaiting the results of the Mexican home study, because of its determination that F required permanency. The decision was, according to Keys, a "time line" decision. As of July 3, 2002, F had been in substitute care for "15 of the most recent 22 months." ORS 419B.498(1)(a) (2001). Father received and understood the July 3 letter but did not contact Keys because the letter said not to.

Three weeks later, on July 24, 2002, Keys spoke with Medina, the contact at the Mexican consulate. Medina told Keys that the home study would be forwarded soon, and Keys responded that, if the home study was favorable and appropriate, DHS would vacate the adoption plan for F.[13] The next day, the Mexican consulate transmitted a copy of the "Social Economic Study" to DHS. The study included photographs of father's new residence and briefly described father's family and his financial and employment circumstances. The final section of the study was a brief psychological evaluation of father, which concluded that father "is adequate/suitable to care for and attend to the child [F]."

DHS was not satisfied with the home study because, in Keys's words, "it wasn't in-depth enough," "it was not very thorough [because] it didn't provide a very good perspective of what life would be like for the child in Mexico." DHS was also concerned that, given father's fourth-degree assault conviction, the report did not describe his criminal history, if any, in Mexico. Forty-five days elapsed as DHS personnel conferred among themselves and with counsel. Ultimately,

---

[12] The petition to terminate father's parental rights was not actually filed until four months later, on November 5, 2002.

[13] Medina told Keys that, if DHS proceeded with the termination of father's parental rights notwithstanding a favorable home study, the government of Mexico would "raise an issue." The record does not disclose any protest by the government of Mexico to DHS's subsequent handling of this matter.

on September 10, 2002, Keys wrote again to the Mexican consulate, requesting that the study be supplemented with "a second thorough investigation of [father's] circumstances, especially his possible criminal history and his potential violent tendencies." The Mexican consulate did not respond to that request.

On September 19, 2002, the court appointed counsel for father. As of that date, F had been within the juvenile court's jurisdiction for nearly two years. The record does not disclose the circumstances of that appointment; for example, there is no affidavit of indigency and request for appointment in the court file. On September 30, Keys sent letters to father and to the Mexican consulate, notifying them that a permanency hearing would be held on October 10 and further indicating that counsel had been appointed to represent father.

On October 10, the permanency hearing occurred. Father did not participate in person or by telephone, but his newly appointed lawyer was present. Father's counsel informed the court that he had been unable to contact and confer with his client and then, over father's counsel's objections, the court signed the permanency plan, approving adoption as the permanent plan. In particular, father's counsel emphasized the home study—"I mean, with a favorable home study, why don't they just send the child down to Mexico?"— but the court, noting father's nonappearance and lack of contact with DHS, was unpersuaded.

When Keys returned to her office after the October 10 hearing, a phone message from father was waiting. In the message, father said that he had been waiting by a telephone in Mexico because the consulate had informed him that Keys or the court would be calling him to participate in the hearing. Later that day, father called Keys again to ask what had happened, and Keys apologized for any miscommunication. Father asked if he should be calling Keys to stay in contact, and she replied—apparently without regard for her July 3 letter—that he should, because that was one of the terms of the service agreement. There is no indication in the record

that Keys promptly informed either the court or father's counsel of her conversation with father.[14]

On November 5, 2002, DHS filed its petition to terminate both parents' rights. With respect to father, the petition alleged, *inter alia*, emotional neglect and failure to maintain contact with the child and DHS. Mother's rights were terminated following a hearing on December 19, 2002.

In early January 2003, father returned to the United States, illegally, walking across the desert for three days.[15] In father's words, he returned to Oregon "[b]ecause no matter what I needed to do, I wanted to get my daughter with me." Father and Sosa secured part-time employment, in part so that the family could afford to retain counsel to assist them on father's outstanding probation violation. Father did not contact DHS both because he thought it would be "a waste of time" and because he was afraid that he would be arrested before he was "ready" to deal with the outstanding probation violation. On two occasions, in January and February 2003, father saw F without DHS's knowledge when she was visiting at his sister's home.[16]

On March 19, 2003, father surrendered himself to the Marion County Sheriff's Office on the probation violation "to clean my record and do things so I could have [F] with me." Father later served seven days in jail for the probation violation and was again ordered to complete the "Solutions" anger-management program, in which he was still participating as of the August 2003 termination trial.

On the next day, March 20, father attended the preliminary hearing with respect to the termination of his parental rights. Until then, DHS was unaware that father

---

[14] Keys did write to father's counsel, recounting the October 10 conversation, nearly a month later, on November 6—one day after DHS filed the petition to terminate father's parental rights.

[15] Sosa entered the United States with father. However, they arranged for F's full brother, M, and her half-brother, E, to enter the United States through other means.

[16] F had continued to see father's family, and particularly Gonzales, periodically after she left Ruelas's care in late 2000. In February 2003, Keys, Gonzales, and the foster mother agreed to an arrangement by which F would visit her paternal relatives for six hours one Sunday each month.

had returned to Oregon. With the exception of his calls to Keys on October 10, father had not contacted DHS for over a year. A week later, on March 27, DHS and father entered into a new service agreement, which purported to identify the steps that the parties were to take "to work together to reunite [F] with the family as soon as possible." Under that agreement, father was to attend the "Solutions" program and to "attend parenting classes when they fit into his schedule." DHS was to refer father to services "as requested," and to arrange for an evaluation of F to determine when and how visitation should occur. Finally, the service agreement stated that, if father did not perform his obligations, DHS would "continue with the alternative plan of adoption."[17]

In accordance with the March 27 service agreement, on April 18, 2003, Keys requested that Dr. Jenne Henderson evaluate F with respect to possible visitation with father. Henderson's evaluation, dated April 21, reports that F, at two years, nine months, showed "average to high-average development" and that she was very affectionate and attached to her foster parents, calling them "mom" and "dad." The evaluation further reports that, because of F's strong attachment to her foster family, removing her from them would be a "significant and traumatic" loss for her. Although F did not presently require specialized treatment or parenting, she would require some specialized treatment if she were removed from her foster family, because of the trauma resulting from separation. In Henderson's opinion, while the loss and trauma could be mitigated by gradual and compassionate transition, the consequences of separation would still be long term and significant.[18]

Between April and July 2003, father had several supervised visits with F. Sosa and F's full brother, M, also

---

[17] At the termination trial, Keys explained that DHS entered into the "service agreement," notwithstanding its determination to continue with termination and an adoptive placement, "due to the fact that [father] was in the country and that we knew that he wanted to have visitation with the child, should we document anything about that * * * [s]o we chose that format to do it on."

[18] At trial, Henderson testified and reiterated the essential features of her opinion. At the same time, Henderson acknowledged, on cross-examination, the desirability of not separating siblings and of children maintaining a connection with their ethnic heritage.

attended at least some of those visits, which went well. During those visits, in accordance with DHS's advice, father referred to himself as "Jaime," and not "father," in order to avoid any unnecessary confusion or trauma to F.

The termination trial occurred on August 25 and 26, 2003. At that time, F was three years and two months old. Father and Sosa were living with M and E in Salem in suitable housing. Father had full-time employment, while Sosa held a part-time job. Father's immigration status and his prospects for remaining in this country were, on this record, at best uncertain. Father testified that he was aware of the trauma that a change of custody might cause F and that, to ensure that she was "safe" and not "emotionally heartbroken," he was amenable to a gradual transition and willing to take parenting classes. Keys, on cross-examination by child's attorney, acknowledged that she had no present reason to be concerned that F might not be safe with father or members of his family.

In closing argument, the attorney for child urged the court not to terminate father's parental rights:

"As the child's advocate, Your Honor, I ask you not to terminate this man's parental rights. From the daughter's perspective, I think it is in her best interest to have contact with this father, to know this father and to—I don't think that this father is a selfish, self-centered person who only cares about himself. I think he was doing the best he had with what he had. I think when we look at the circumstances that he was under, his background, his education, his understanding of the situation, the relationship that he was in with [mother], his opportunities at the time that he left the United States originally and went to Mexico and didn't know the child was born—well, didn't know that [mother] was pregnant, his options when he is down there, what he is doing to work, what he is doing to take care of the child that he does have, establishing a new relationship, moving on out of the relationship with [mother], keeping contact with his mother—the plan that his mother was taking care of the child seemed like a decent plan to him. From everything that I have heard, it seems like this man was doing the best that he had with what he had."

The trial court concluded that termination was warranted based, alternatively, on the petition's allegations of neglect and unfitness. The thrust of the court's assessment was "too little; too late"—that is, that father was not initially interested in F; that he was willing to leave her with mother, notwithstanding mother's manifest problems, while he remained in Mexico; and that, even after mother utterly failed, father's response was tentative at best—and, with respect to maintaining contact with F and DHS, virtually nonexistent. The court observed:

"If [mother] still was involved in [F's] life, you would not be. You would be in Mexico. You would be with [Sosa] and you would be raising your two boys, and you wouldn't be paying a dime and you wouldn't care about what was going on with [F]. That's what it all really boils down to.

"You might think about her on occasion, but you would get on with your life. Let her have her child, the girl child, that she wanted for her entire life and go on. She failed miserably, and you knew that. You knew it when you left for Mexico.

"For six years she's been using drugs and stealing from you, and you knew that when your child was born and was yours and very soon after that, that being [F], you did not come to take her away. And that is your responsibility as a parent, for which you did not step up and take care of."

On appeal, father raises a variety of arguments, procedural and substantive. As described below, we conclude that the state failed to establish by clear and convincing evidence that father's rights should be terminated based either on ORS 419B.504 (2001) or ORS 419B.506 (2001). Accordingly, we reverse on that basis and do not address father's procedural objections.

■ We begin with unfitness. As pertinent to this case, ORS 419B.504 (2001) provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not

likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"\* \* \* \* \*

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."[19]

██   The state must establish unfitness by clear and convincing evidence. That standard "requires a showing that it is highly probable that [father is] not presently able, and will not be able within a reasonable time, to meet [the child's] physical and emotional needs." *State ex rel SOSCF v. Mellor*, 181 Or App 468, 474, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003). If that standard is satisfied, we must then determine whether termination is in the child's best interest. *Id.*; ORS 419B.500 (2001).

The state argued, and the trial court agreed, that father had failed to make a reasonable effort to adjust his circumstances so that F could be placed with him. In particular, the state emphasizes that father had only one contact with DHS during the first 20 months of F's life, until March 2002, and then had only one additional contact in the following year; that father saw F only once in the first 31 months of her life until January 2003; and that, in general, father was unresponsive, uninterested, and, at best, ambivalent about assuming any responsibility for F's future well-being.

With respect, the state's characterization of the history of father's contacts with F and with DHS, while accurate, is incomplete. It is true that father did not see F until March 2002 and that his only contact with DHS before then was his September 2001 telephone call to the caseworker.

---

[19] There is no suggestion in this record that father has any emotional or mental illness, has physically or sexually abused any child, uses liquor or controlled substances to the extent of impairing his "parental ability," has physically neglected F, or has engaged in criminal conduct that impairs his ability to provide adequate care to F. *See* ORS 419B.504(1) - (4), (6) (2001).

But it is also true that, until late January 2002, DHS had directed its efforts exclusively towards effecting reunification with mother; that father was essentially ignored as a placement resource; and that, in his single contact with DHS, father told the caseworker that, if the efforts towards reunification with mother failed, he wanted to be a resource. The state's characterization also discounts the fact that, when mother did fail and father learned of that failure, he promptly returned to Oregon despite his immigration status and the outstanding warrant for his arrest. He then contacted DHS, agreed to a plan, including the performance of a home study in Mexico, by which F could be placed with him, and visited F.

The state is correct, again, that father's contacts with DHS during the next year, until March 2003, were minimal. However, that "nonresponsiveness" must be viewed in circumstantial context. Father left Oregon in March 2002, believing, reasonably, that, if the home study was favorable, F would be placed with him. He heard nothing from DHS in April, May, or June.[20] When he was contacted by the agency performing the home study in late June, father asked for some time to obtain more suitable housing, which he then undertook to do. That is, he adjusted his circumstances to facilitate F's placement with him, M, E, and Sosa. Then, on July 3, DHS informed father that it intended to file a termination petition—that letter was DHS's first communication with father since March. Beyond that, the letter, while giving father some cursory information about how to obtain counsel, instructed him that he was to have no further contact with the agency about F and her future, except through counsel.

DHS wrote to father only once more—in late September 2002, informing him of the October 10 permanency hearing. Father responded by requesting a day off from work and sitting by a telephone, waiting for a call that never came. He then followed up by calling Keys twice, once leaving a message and then, when there was no response,

---

[20] As noted, DHS did not request the home study until April, a month after father's visit, and did not press for prompt action until June, three months after father's visit. *See* 194 Or App at 400. The record bears the inference that, even then, DHS pressed for action largely because its continuing efforts to effect reunification with mother had, once again, proved unavailing.

calling again. When he reached Keys, father reiterated that he still wanted F to be placed with him in Mexico and that he was "trying hard."[21]

In January 2003, father made the most dramatic and concrete adjustment of his circumstances: He returned to the United States, at substantial personal risk, so that he could be reunited with F. Father returned to Oregon with his family, obtained employment, saw F twice, and surrendered himself on the probation violation, serving jail time, "to clean my record."

■ All of that was prelude. The focus under ORS 419B.504 (2001) is on the parent's circumstances as of the time of the termination trial. *See Mellor*, 181 Or App at 474; *see also State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). Here, as of August 2003, father had returned to Oregon, obtained employment and suitable housing, and, with Sosa, was supporting F's older brother and her younger half-brother. There is no indication in the record that father was in any way deficient as a parent with respect to F's siblings. Further, father had visited F regularly and showed commendable sensitivity to her needs. In particular, father was amenable to a gradual transition of custody to ameliorate the trauma that F would experience from being separated from her long-time foster parents.

■ In sum, we agree with the state that father could have, and perhaps should have, been more responsive to DHS and attentive to F's needs in earlier years. But that is not the standard for termination pursuant to ORS 419B.504 (2001). Our focus is necessarily on father's capability as of August 2003. The state failed to prove that, as of that time, it was highly probable that father was not presently able, and

---

[21] As noted, *see* 194 Or App at 403-04, in approving the permanency plan on October 10, the court emphasized father's failure to attend or participate. Keys attended the permanency hearing. Nevertheless, there is no indication that, upon speaking with father later that day and discovering the miscommunication, Keys promptly so informed the court. Indeed, as noted, *see* 194 Or App at 404 n 14, it appears that Keys waited nearly a month—until the day after DHS filed the termination petition—to inform even father's counsel of her conversations with his client.

would not be able within a reasonable time, to meet F's physical and emotional needs. *Mellor*, 181 Or App at 474. Accordingly, the trial court erred in ordering termination of father's parental rights on that basis.

We turn, then, to neglect. As pertinent here, ORS 419B.506 (2001) provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of a petition. In determining such failure or neglect, the court shall disregard any incidental or minimal expressions of concern or support and shall consider but is not limited to one or more of the following:
>
> "* * * * *
>
> "(2)  Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.
>
> "(3)  Failure to contact or communicate with the child or with the custodian of the child. In making this determination, the court may disregard incidental visitations, communications or contributions."

The state argued, and the trial court agreed, that termination was warranted because father had failed to maintain regular contact with DHS or F for the six months preceding the filing of the termination petition on November 5, 2002. The state emphasizes that, between May 5 and November 5, 2002, father contacted DHS only once—his telephone calls to Keys on October 10—and that, during that entire period, father never once sent letters or pictures to Keys, to be shared with F, as specified in the March 13, 2002, letter of expectation.

The question is close. Nevertheless, we conclude that the state did not prove, by clear and convincing evidence, that father unreasonably failed to maintain appropriate contact with F and with DHS for the six months preceding the filing of the termination petition. Our conclusion flows from two

considerations—with the second, frankly, being by far the more important.

First, while it is undisputed that father failed to send Keys letters that she could read to F, it is far from certain that he failed to send pictures in accordance with the letter of agreement. Again, that letter stated that father was to

"[m]aintain contact with [F] by sending letters to your caseworker that she can read to [F]. Also send her pictures of yourself to help her remember what you look like. We want to help you and [F] grow closer."

Although the first sentence states that letters should be sent to the caseworker, Keys, the second sentence, pertaining to photographs, includes no such limitation. Indeed, reasonably understood, the references to "her" (*e.g.*, "send her pictures") in the second sentence are to F, not Keys. As noted, there is no indication in the record that father had the address of F's foster parents, *see* 194 Or App at 399 n 8, so, by reasonable inference, he could not send the pictures directly there. However, as also noted, *see* 194 Or App at 401, father did give Gonzales pictures of him and his family to share with F.[22] Although the record does not disclose when that exchange occurred, there is at least a reasonable possibility that it was during the pertinent time period. In particular, although father acknowledged that he had "not really" sent cards and photos in accordance with the letter of explanation, he explained:

"But I was concerned that my sister and my mom have pictures of me and have pictures of us together. And when they got to visit her those few times that they had the chance to see her, I always told them to show them pictures of me, because I was not sure if [the foster mother's] pictures were going to be seen by [F]. I was not sure of that. And I was thinking if I send letters and pictures just to be

---

[22] At trial, the following colloquy occurred between the court and Gonzales:

"THE COURT: Did your brother ever give you anything to take back to give to [F] when you were down in Mexico?

"* * * * *

"THE WITNESS: Yes. Pictures of the family.

"THE COURT: Pictures of his family down there?

"THE WITNESS: Uh-huh."

lost like my sister's papers [Gonzales's application to be a foster parent]. I wasn't going to waste my time on that."

Thus, in the totality of the circumstances, there is considerable uncertainty as to when father took steps to ensure that F would see pictures of him. Given that uncertainty, and given the rigor of the "clear and convincing" standard of proof, we conclude that the state failed to show that father failed to provide F with any pictures during the six months preceding November 5, 2002.

Still, we are cognizant of the statutory caveat that, in determining neglect, we are to "disregard any incidental or minimal expression of concern or support." ORS 419B.506 (2001). Further, it is undisputed that father failed to send any letters and that he had only one contact with DHS during that period. That, in turn, implicates our second, and predominant, reason for concluding that the state failed in its burden with respect to establishing neglect: The state failed to prove, by clear and convincing evidence, that, in the totality of the circumstances, father's failure to maintain contact with DHS and F between May 5 and November 5, 2002, was "without reasonable and lawful cause." ORS 419B.506 (2001).

Father's nonresponsiveness must be viewed against the circumstantial backdrop. When father left Oregon in March 2002, he understood that DHS would arrange for a home study and, if that study was favorable, F would be placed with him in Mexico. He also understood that not only was he to send letters for F to Keys and maintain contact with DHS but also that Keys would, within several weeks, contact him and communicate with his family in Oregon regarding the agency's efforts and what further actions he needed to take. Keys did not contact father or his family, except, perhaps indirectly, through Medina urging father to cooperate in the home study. Instead, DHS's next direct communication with father—which came as he was cooperating with the home study process by seeking suitable housing—was the July 3, 2002, letter, which stated, without explanation, that DHS was proceeding with termination and that father was to have no further contact with DHS, except through a lawyer.

Thus, on July 3, two months into the six-month pre-petition time frame, the relationship between father and DHS was fundamentally altered. Instead of working cooperatively toward completion of the home study and possible placement of F with father in Mexico, DHS, without warning or explanation, told father that it was pursuing termination. DHS did not tell father—as Keys later told Medina, *see* 194 Or App at 402—that the decision to proceed with termination would be rescinded if the home study proved to be favorable. Nor did DHS tell father that, as Keys testified at trial, the decision to seek termination was a "time line" decision—notwithstanding that DHS did not actually file the termination petition until four months later.

The reasonableness of father's conduct after July 3 must also be viewed in the context of his circumstances. He was living in Mexico, unable to return lawfully to the United States, and he was not represented by counsel. Although the July 3 letter informed father that he could contact the juvenile court to request appointed counsel, nothing in DHS's July 3 letter indicated that the agency's decision to seek termination could or would be altered even if father attempted to contact Keys through appointed counsel.

Given the totality of DHS's interactions with father and his family, and the timing and the content of the July 3 letter, we cannot conclude under a "clear and convincing" standard that father's lack of contact with DHS and F between July 3 and November 5, 2002, was "without reasonable and lawful cause." We imply no approval of father's failure to contact DHS or to send Keys letters for F between May 5 and July 3—or, for that matter, from March 14 until July 3. Nevertheless, a person in father's situation as of July 3 could reasonably have understood, upon receiving DHS's letter, that further efforts towards reunification would be futile. Indeed, such a person might well have felt "whip-sawed" or "sandbagged"—that DHS, after having committed to pursuing a home study, had decided, without any warning or explanation, to seek termination.[23] Moreover, a reasonable

---

[23] Such a reaction would reasonably have been corroborated by the awareness that DHS had inexplicably lost Gonzales's application to act as a foster placement for F.

person receiving the July 3 letter would have understood that further communication with the agency, except through counsel, was precluded—and that that prohibition included sending letters to F through Keys. Father's only alternative means of communicating with F was indirectly, through his family; as noted, the record is ambiguous as to whether any such communication occurred during the pre-petition period and, particularly, after July 3. *See* 194 Or App at 412-13.

The state contends that father should, nevertheless, have immediately contacted the juvenile court, requested appointed counsel, and then communicated through counsel with DHS and, by extension, F. To be sure, in the abstract, that course of action was available to father. And yet, in the concrete reality of this case, the state's suggestion begs the question: Was it unreasonable for father to understand from the July 3 letter and the fact that DHS had apparently repudiated its commitment to pursuing the home study that any further contact, including through appointed counsel, would be futile? We believe that, in the totality of circumstances, such an understanding was not unreasonable.

Ultimately, the inquiry in this case, as in many, perhaps most, cases involving termination of parental rights, is fact-specific. On this record, we conclude that the state failed to establish by clear and convincing evidence that father's failure to maintain regular contact with F and DHS, including as specified in the March 13 letter of expectation, during the six-month period preceding the filing of the termination petition was "without reasonable and lawful cause." ORS 419B.506 (2001). Accordingly, the trial court erred in ordering termination of father's parental rights on the basis of neglect.[24]

Reversed.

---

[24] Given our analysis and disposition with respect to both unfitness and neglect as alternative grounds for termination, we need not, and do not, address whether termination of father's parental rights would be in F's best interests. ORS 419B.500 (2001).